CHELROB, INC., et al., Suing on Their Own Behalf and on Behalf of All Other Stockholders of Queens Borough Gas & Electric Company, Similarly Situated, Appellants, *v.* EDWARD F. BARRETT et al., Respondents, et al., Defendants.

Argued October 20, 1943; decided October 20, 1944.

*Milton Paulson, Abraham L. Pomerantz, Harry Tabershaw, Robert C. Richter, Joseph A. Ruskay* and *Edwin V. Hellawell* for appellants. I. The Appellate Division improperly reversed Special Term's finding of domination, which was amply supported by the evidence. As dominant stockholder, Long Island owed Queens the fiduciary duty to deal fairly with it. (*Matter of Long Beach Gas Co., Inc., v. Maltbie,* 264 App. Div. 496; *Southern Pacific Co. v. Bogert,* 250 U. S. 483; *Kavanaugh v. Kavanaugh Knitting Co.,* 226 N. Y. 185; *Farmers L. & T. Co.*

v. *N. Y. & N. R. Co.*, 150 N. Y. 410; *Sage* v. *Culver*, 147 N. Y. 241; *Pepper* v. *Litton*, 308 U. S. 295; *Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113; *Nesbit* v. *Lockman*, 34 N. Y. 167; *Meeker* v. *Winthrop Iron Co.*, 17 F. 48.) II. The judgment of Special Term was inadequate in failing to reimburse Queens the true cost of the gas sold to Nassau. (*White* v. *Rankin*, 18 App Div. 293, 162 N. Y. 662.) III. Queens is entitled to judgment jointly against Nassau, Long Island and the directors of Queens. (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185; *Gallin* v. *National City Bank of New York*, 155 Misc. 880.)

*Charles G. Blakeslee, John J. Donohue, John C. Bruckmann* and *Charles E. Elbert* for Long Island Lighting Company, respondent. I. The boards of directors of Nassau and Queens had power to enter into contracts providing for intercompany sales and purchases of gas. In the absence of fraud or collusion, the court may not interfere with the free exercise of this power or change the terms of such contracts. (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113; *Winter* v. *Anderson*, 242 App. Div. 430; *Cleary* v. *Higley*, 154 Misc. 158, 246 App. Div. 698, 270 N. Y. 673; *Rous* v. *Carlisle*, 261 App. Div. 432; *Marony* v. *Applegate*, 266 App. Div. 412; *City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62; *Liebman* v. *Auto Strop Co.*, 241 N. Y. 427; *Holmes* v. *Saint Joseph Lead Co.*, 84 Misc. 278, 163 App. Div. 885.) II. The Appellate Division properly reversed Special Term's finding that Long Island dominated Nassau and Queens. (*Burden* v. *Burden*, 159 N. Y. 287; *Continental Ins. Co.* v. *N. Y. & H. R. R. Co.*, 187 N. Y 225; *Venner* v. *New York Central & H. R. R. Co.*, 160 App. Div. 127, 217 N. Y. 615; *Manson* v. *Curtis*, 223 N. Y. 313; *Continental Securities Co.* v. *Belmont*, 206 N. Y. 7; *Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113; *Blaustein* v. *Pan American Petroleum & Transport Co.*, 263 App. Div. 97; *Winter* v. *Anderson*, 242 App. Div. 430.) III. The record establishes, and the Appellate Division properly found, that the contracts made were fair and just. (*Farmers L. & T. Co.* v. *N. Y. & N. R. Co.*, 150 N. Y. 410; *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185; *Southern Pacific Co.* v. *Bogert*, 250 U. S. 483; *Flynn* v. *Brooklyn City R. R. Co.*, 158 N. Y. 493; *City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62.) IV. Queens sustained no loss as the result of selling

gas to Nassau at the prices fixed by contract. (*In re Atlanta Gas Light Co.*, P. U. R. 1931-E 461; *Hassett* v. *Rathbone*, 204 App. Div. 229; *Cohen* v. *Long Island Railroad Co.*, 154 App. Div. 603; *Young* v. *Valentine*, 177 N. Y. 347; *Morley* v. *Castor*, 63 App. Div. 38; *Skinner & Eddy Corp.* v. *United States*, 249 U. S. 557; *Interstate Comm. Comm.* v. *Chicago G. W. Ry.*, 209 U. S. 108.)

*Jackson A. Dykman* and *Edward J. Crummey* for Nassau & Suffolk Lighting Company, respondent. I. Voting control creates no absolute liability. (*Hoyt* v. *Thompson's Executor*, 19 N. Y. 207; *Beveridge* v. *N. Y. E. R. Co.*, 112 N. Y. 1; *City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62; *Blaustein* v. *Pan American Petroleum & Transport Co.*, 263 App. Div. 97; *Weinberger* v. *Quinn*, 264 App. Div. 405, 290 N. Y. 635; *O'Connor* v. *Virginia Passenger & Power Co.*, 184 N. Y. 46; *Gerdes* v. *Reynolds*, 281 N. Y. 180; *New York State Electric & Gas Corp.* v. *Maltbie*, 147 Misc. 560; *Prentis* v. *Atlantic Coast Line*, 211 U. S. 210; *Prendergast* v. *N. Y. Tel. Co.*, 262 U. S. 43; *Peoples ex rel. D. & H. Co.* v. *Stevens*, 197 N. Y. 1; *Matter of Rochester Gas & Electric Corp.* v. *Maltbie*, 258 App. Div. 682, 284 N. Y. 626; *Gamble* v. *Q. C. W. Co. et al.*, 123 N. Y. 91.) II. The same test is applied to acts of directors and majority stockholders in their dealings on behalf of a corporation. (*Gamble* v. *Q. C. W. Co. et al.*, 123 N. Y. 91; *Rous* v. *Carlisle*, 261 App. Div. 432, 290 N. Y. 869; *Venner* v. *New York Central & H. R. R. Co.*, 160 App. Div. 127, 217 N. Y. 615; *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185; *City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62; *Everett* v. *Phillips*, 288 N. Y. 227; *Kovarsky* v. *Brooklyn Union Gas Company*, 253 App. Div. 635, 279 N. Y. 304.) III. Queens sustained no loss as the result of the sale of gas to Nassau. (*City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62; *Marony* v. *Applegate*, 266 App. Div. 412.) IV. There is no evidence of domination. (*Venner* v. *New York Central & H. R. R. Co.*, 160 App. Div. 127, 217 N. Y. 615.) V. Appellants' assertion that the judgment of the trial court was inadequate is erroneous in law and fact. (*White* v. *Rankin*, 18 App. Div. 293, 162 N. Y. 622; *Blaustein* v. *Pan American Petroleum & Transport Co.*, 263 App. Div. 97.)

*Stephen Callaghan, Ralph Stout* and *Thomas A. Gaffney* for Ellis L. Phillips and others, respondents. Plaintiffs failed

to establish any cause of action. (*Blaustein* v. *Pan American Petroleum & Transport Co.*, 263 App. Div. 97; *Flynn* v. *Brooklyn City R. R. Co.*, 158 N. Y. 493; *City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62; *Winter* v. *Anderson*, 242 App. Div. 430; *Holmes* v. *Saint Joseph Lead Co.*, 84 Misc. 278, 163 App. Div. 885; *Everett* v. *Phillips*, 288 N. Y. 227; *Continental Ins. Co.* v. *N. Y. & H. R. R. Co*, 187 N. Y. 225; *Marony* v. *Applegate*, 266 App. Div. 412; *Weinberger* v. *Quinn*, 264 App. Div. 401, 290 N. Y. 635; *Gamble* v. *Q. C. W. Co. et al.*, 123 N. Y. 91.)

*Charles G. Blakeslee* for Edward F. Barrett and others, respondents.

*Philip Huntington* for F. H. Maidment, respondent. The record herein does not present any basis in fact or in law for imposing the contingent liability provided for in the judgment, as originally made and entered herein, upon any of the directors individually.

LEHMAN, Ch. J. The defendant corporations, Long Island Lighting Company, Queens Borough ·Gas & Electric Company and Nassau & Suffolk Lighting Company, are public utility companies organized under the laws of the State of New York, serving sections of Long Island. Prior to .1927 Long Island Lighting Company (hereinafter referred to as " Long Island ") acquired the common or voting stock of Queens Borough Gas & Electric Company (hereinafter referred to as " Queens "). Six per cent cumulative preferred stock of Queens of the par value of $6,686,000 remains in the hands of the public. In 1927, Queens acquired the common or voting stock of Nassau & Suffolk Lighting Company (hereinafter referred to as " Nassau "). Seven per cent cumulative preferred stock of Nassau of the par value of $2,726,200 remains in the hands of the public. In 1928 Queens expanded its production plant and transmission facilities to enable it to sell gas to Nassau. Since that time Nassau has purchased from Queens a substantial part of the gas it furnishes to consumers within the territory it serves and in addition has purchased from Queens gas which it resold to Long Island. The price of the gas sold by Queens to Nassau was fixed by the directors of the two corporations. All of them had been elected by Long Island, which directly **or**

indirectly held the voting stock of both corporations. Dividends on the preferred stock of Queens have been in arrears since 1937 and several holders of preferred stock of Queens. claiming that the price paid to Queens by Nassau was unreasonable and caused a loss to Queens, brought actions against the corporate and individual defendants for an accounting of the resulting profits which the defendants may have obtained and the losses which Queens suffered.

The actions were consolidated and, pursuant to the provisions of section 96-a of the Civil Practice Act, the consolidated action was tried together with an action brought by preferred stockholders of Nassau who claimed that Long Island had compelled Nassau to sell to it for an inadequate and unfair price some of the gas which Nassau had purchased from Queens (*Espach* v. *Nassau & Suffolk Lighting Co.*, 293 N. Y. 463, decided herewith in separate opinion). Mr. Justice McGarey at Special Term (177 Misc. 521) held that Long Island dominated both Queens and Nassau and that the price fixed by the directors of these companies for gas purchased by Nassau from Queens was inadequate and caused loss to Queens, and granted judgment in favor of Queens against Long Island and Nassau in the sum of $387,020, as an additional price for gas supplied after 1934, with interest at the rate of 2%. Any cause of action for additional compensation for gas furnished prior to that date, he held, was barred by the Statute of Limitations. The judgment directs that " as between Nassau and Suffolk Lighting Company and Long Island Lighting Company, said judgment shall be paid by Nassau and Suffolk Lighting Company ". The complaints against the individual defendants were " dismissed upon the merits * * * without costs to any party as against any other party and without prejudice to the bringing of an action against the defendant directors in the event that this judgment is not paid ".

All parties appealed to the Appellate Division. The plaintiffs acquiesced in the ruling that the six-year Statute of Limitations applied but claim that the judgment in their favor based on alleged wrongs since 1934 is inadequate. The defendants claim that the directors acted honestly and carefully, seeking in good faith to promote the interests of both corporations, and

that the price fixed by them was fair. The Appellate Division unanimously reversed on the law and the facts the judgment in favor of the plaintiffs and directed judgment dismissing the complaint on the merits against all the defendants. It expressly reversed some of the findings of the Justice at Special Term and found many of the findings proposed by the defendants. It did not reverse some significant findings of the trial court.

Long Island acquired all the voting stock of Queens and indirectly of Nassau with the written consent and approval of the Public Service Commission of the State. The defendant Ellis L. Phillips and a small group of associates owned and controlled, directly or indirectly, a substantial majority of the voting stock of Long Island. By voting that stock they elected the directors of Long Island who, in turn, chose the directors of Queens and of Nassau. A majority of the directors of Queens and of Nassau were at all times also directors and, in some cases, were paid officers or employees of Long Island and some of the directors of Nassau were also directors of Queens. The three corporations maintained their separate corporate form and conducted their business as separate corporate entities. So long as preferred stock of Queens and of Nassau was outstanding the corporations could not be merged. Nevertheless the three corporations were operated through their interlocking directorate as parts of a single system. Such operation is not forbidden by law or unjust to any of the corporations in the system if the interests of each corporation are zealously safeguarded by its own board of directors. Indeed, such operation may be more economical and efficient and may benefit the public and all the corporations. We may perhaps assume that otherwise the Public Service Commission would not have given its consent and approval to the acquisition by Long Island of the voting stock of the other corporations.

Nonetheless, the directors of each corporation — though all elected by Long Island — may authorize corporate action by the corporation which they represent only if in their considered opinion such action will promote the best interests of that corporation and is fair to it. That is a fiduciary obligation to the corporation and indirectly to its stockholders and creditors which its directors have assumed. In the operation of separate

utility corporations as a single system, agreement must be reached by the directors of the separate corporations in regard to the share of each corporation in such operation and the compensation to be paid by one to the other. The compensation to be paid for benefits received is ordinarily fixed by negotiation or bargaining, but where in negotiations between two corporations the same men represent both, their determinations are subject to judicial scrutiny. In this case we are confronted with the question of what relief may be afforded when such determinations are predicated upon mistake of fact entering into the fixation of the price to be paid by one corporation to the other. The plaintiffs challenge, on that and other grounds, the agreement reached by the boards of directors of Queens and of Nassau. Under its terms Nassau purchases gas from Queens at a price which it is said causes a loss to Queens. The plaintiffs charge that in making the challenged agreement the interests of Queens were disregarded by its directors acting under the domination of Long Island and for the benefit of Long Island and Nassau, rather than of Queens.

Most of the charges of flagrant wrong contained in the complaint were abandoned by the plaintiffs and the Trial Justice found against the plaintiffs in regard to some other charges. These findings were not reversed by the Appellate Division and are sustained by the evidence. The Trial Justice refused to find that the directors had acted wrongfully but did find in favor of the plaintiffs that the price fixed by these directors was unfair to Queens and caused a loss to it. Upon the basis of that finding he concluded that Queens must now receive the difference between the agreed price for the gas it furnished to Nassau and the price which Nassau should have been required to pay. The Appellate Division has held that the price was determined by the directors of the two corporations acting honestly and carefully and that the court may not set aside a price so fixed even if it be the result of bad judgment or error and that the price fixed in this case was not unfair and caused no loss to Queens.

Before 1927 when Queens acquired the common stock of Nassau, Nassau made, at its own plant, the gas which it supplied to consumers within the territory it served and, in addition, gas which it sold to Long Beach Gas Company and to Public

Service Corporation of Long Island, utility corporations operating in contiguous territory and controlled by the same group which at that time owned the common stock of Nassau. When Queens acquired the common stock of Nassau it also acquired the common stock of Long Beach, and Long Island then acquired the common stock of Public Service Corporation. Thus, the three affiliated corporations which had obtained gas from the Nassau plant became parts of the same system or group of utility corporations as Queens, all under the stock control of Long Island. The plant owned by Nassau had no access to water where delivery of materials could be made and it could not be operated economically and efficiently unless extended and improved. It could supply the gas needed by Nassau as well as the two affiliated corporations to which Nassau had supplied gas only if it operated with three shifts a day. Queens, on the other hand, owned a plant which could be operated very efficiently and economically. Materials for making gas were delivered at the plant by water and were handled automatically. It produced gas at a low cost — below the average production cost of Nassau. The plant of Queens had a capacity greater than the needs of Queens and its facilities could be extended sufficiently to supply to Nassau the gas required by it and the gas which Nassau had supplied to affiliated corporations. Under these circumstances, commencing in 1928, Nassau reduced the production of gas at its plant and since then has purchased from Queens a substantial part of the gas required by it for distribution to consumers within the territory it served and for resale to Long Island or to Public Service of Long Island.

Gas mains interconnecting the utility corporations were constructed in order to carry out this arrangement. Expenditures were also made by Queens to increase and improve the production and distributing facilities of its plant. The evidence established and the courts below have found that: " The construction of gas mains and the resulting interconnection of the distribution system of the said utility corporations constituted good sound business policy on the part of the respective companies, and said interconnections insured each company of a supply in the case of any emergency, and thereby benefited the general consumers and each of the respective utilities herein." The gas supplied by Queens to Nassau and in part resold by

Nassau to Long Island was produced at the plant which could make it at the smallest cost and any agreement by which Nassau and Long Island could obtain gas from Queens at a price lower than either of them could produce gas or obtain it from others and higher than the average cost to Queens of producing and supplying gas would, it is plain, benefit both. By the findings of fact of the court at Special Term, sustained by the weight of the evidence and approved by the Appellate Division, the controversy between the parties to this litigation is reduced to the question whether the price fixed by the directors of the purchasing and selling corporations was fair to each and benefited each.

In 1928 when the intercompany purchases and sales began, both Queens and Nassau had earnings far in excess of the amount required to pay dividends on their outstanding preferred stock and since Long Island owned all the common stock of Queens and Queens owned all the common stock of Nassau, the balance of the earnings of both companies, after payment of the preferred stock dividends, eventually reached the treasury of Long Island. In these circumstances it made little, if any, practical difference to anybody whether the intercompany price was too high or too low. What was important was that all the companies in the system should be efficiently and honestly operated and the record does not show that any of the directors selected for the companies in the system by Long Island or by the group which had voting control of Long Island were remiss in the performance of their duties in that respect, and the courts below agreed that there was no dereliction on their part.

Since the profits of all the corporations — with the exception of the small amount paid out as dividends on the preferred stock, ultimately came into the treasury of Long Island and Long Island elected all of the directors of these corporations, including some who were paid officers of Long Island — the employment of completely independent engineering and legal staffs might have been wasteful. As might be expected, engineers selected for their ability by Long Island, at times give advice and assistance to all the companies in the system and there is only one legal department for all the corporations in the system. Where the interests of companies in the system might conflict, the general legal department advises both by

assigning one of the attorneys in the department to each side. The joint use of competent expert advisers and professional staffs is doubtless entirely justifiable. We do not refer to it as an indication that any corporation has suffered a wrong. It is, however, a circumstance which may not be overlooked in considering whether the agreement by Queens to supply gas to Nassau for the stipulated price may be challenged by minority stockholders of Queens.

The evidence shows and the courts below have found that engineers retained by Long Island or by the defendant Ellis L. Phillips, its president, who was a director of Long Island and of both Nassau and Queens, made studies of the comparative cost of producing gas at the plants of Queens and of Nassau, of the possibility of enlarging and improving both plants or either, and of the comparative advantages to each corporation of obtaining gas for its own requirements from its own plant or of utilizing the most efficient plant of any company to supply gas to all companies. We shall hereafter refer to the contents of these reports. At this point it is sufficient to say that the evidence establishes, as both courts below agree, that the experts who made these studies were men of ability and integrity.

Upon that evidence the court at Special Term found, and the Appellate Division approved the finding, that "the price at which said gas was sold as set forth in the said contracts was arrived at by study of the physical and operating situation by competent engineers and those experienced in the operation of gas utilities, and the said prices in said contracts were determined after consideration by the boards of directors of said corporations, and that reports recommending the prices at which gas should be sold, as aforesaid, were prepared by competent engineers and fully discussed and considered, and the provisions of said contracts were thoroughly discussed by the officers and directors of said corporations, and contracts for the sale of gas, as aforesaid, were made after an investigation and discussion of the prices to be charged for gas, as stated in said contracts, and that none of the directors of said corporations was guilty of fraud, bad faith or overreaching, in negotiating the said contracts." The defendants had proposed a finding in exactly this language except that the proposed finding

stated that the prices were determined after " careful " consideration by the directors and the contracts were made after a " full and complete " investigation and discussion. The Appellate Division in its order of reversal made and allowed the finding as proposed by the defendants, thus restoring the words excised by the Justice at Special Term.

In the reports of the engineers which the directors considered and studied in fixing the price which Nassau should pay for gas supplied by Queens, the price which the engineers recommended was determined by them upon a formula whereby the cost of the *labor and material used in the production* of all the gas made at Queens was allocated *pro rata* to the gas supplied by Queens to consumers within the territory it served and the gas sold to Nassau, so that Nassau paid to Queens the average " direct " or " commodity production cost " of supplying the gas, but the " indirect " cost of supplying gas, that is, such expenses as taxes, insurance, pumping, as well as interest on investments, was allocated on the " increment cost " method, and Nassau paid to Queens only the *additional* cost which Queens incurred in producing the additional gas supplied to Nassau. Since Queens owned a plant with capacity beyond the needs of Queens, the average cost of labor and material required for the *production* of the additional amount of gas was lower than the average cost of producing only the amount required by Queens to supply gas to general consumers and was, of course, lower than the average cost of producing gas at the less efficient plant of Nassau; and since Nassau was required to pay to Queens the " average commodity production cost " of gas and the additional " indirect " expenses incurred by Queens in supplying the additional gas, it is plain that both companies would benefit to some extent by the purchase and sale of gas at a price fixed in accordance with that formula. For that reason the court at Special Term held that the price thus fixed and paid until 1936 was not unfair to Queens and should not be set aside by the court though errors in applying the formula should be corrected by the court.

The plaintiffs do not contend that a price fixed in accordance with that formula would cause loss to Queens or would in all circumstances be unfair to that company. In 1936 the price

paid by Nassau was, however, reduced. At that time the defendant Maidment, the holder of a considerable|amount of preferred stock of Nassau and a director, member of the price committee, and vice-president of that corporation, insisted that the price paid to Queens for gas supplied by it must be reduced or Nassau would proceed to enlarge its plant and itself produce the gas it needed. Maidment was not a director of Queens. Nassau had not bound itself by contract to continue to purchase gas from Queens for a definite term. Though the expenditures by Queens for the extension and improvement of its plant and transmission system without insisting upon such a contract with Nassau might well have been criticised as ill-advised if Nassau had been an entirely independent corporation dealing with Queens at arm's length and able to procure the gas it needed either from a competitive producer or by manufacting it in its own plant, yet Maidment as a director of Nassau who had assumed no fiduciary obligation to Queens was justified in demanding that no higher price be exacted from Nassau for gas supplied by Queens than the cost at which Nassau could obtain the gas elsewhere. The directors of Queens could not, however, accept from Nassau a price which would not be fair to it.

In a finding approved by the Appellate Division the trial court has stated the limits of what may constitute a fair price: " 64. That a fair price to be charged for the gas sold, as aforesaid, falls within certain limits. To the selling company it is the additional cost to the seller, including additional operating expense incurred by the seller and fixed charges on additional plants installed for the purpose of making the transfer over and above the cost of the operating expenses and fixed charges on plants which would be incurred by the seller if the sale of gas were not made; and to the buying company the maximum reasonable price would be the competitive additional cost at which the buying company could secure the quantity of gas transferred either by manufacturing it itself in its own facilities, or by purchasing it from some alternative source, and this additional competitive cost of the buying company is the limit beyond which the purchasing company would not be justified in buying the gas and the price beyond which it could not be justified in paying."

The general rule so formulated is not challenged upon this appeal. When objection was made to the price of gas which Nassau was then paying to Queens and to the formula upon which that price had been calculated in reports of engineers submitted to Queens and to Nassau, Mr. Phillips, president of Long Island, directed engineers to make new studies of the price which Nassau should thereafter pay to Queens. In their report, they recommended a price based upon the engineers' estimate of the cost to Nassau of enlarging its facilities and itself producing the gas. The report was submitted to Mr. Phillips and considered and approved by the board of directors of Long Island at a meeting in which many of the directors of Queens and Nassau took part. Then the same directors took part in meetings of the boards of directors of Queens and of Nassau, and the same report was approved at these meetings also and the price fixed accordingly.

The evidence establishes, and the trial court has made a finding not reversed by the Appellate Division, that: "19. During all of the time that Queens Borough Gas & Electric Company has been selling and delivering gas to Nassau & Suffolk Lighting Company, there have been restrictions to the expansion of Nassau & Suffolk Lighting Company's production plant, which limited further expansion." That finding completely destroys the basis of the report of the engineers upon which the directors of Queens and Nassau acted in fixing the price. A fair price which Queens should receive for the gas it sells to Nassau cannot be based upon an estimate of the hypothetical cost of expanding the plant belonging to Nassau and of producing there the gas required by Nassau where further expansion is not feasible. It is true that the Trial Justice also found that Nassau "was in a position, *in the opinion of its officers and directors* to have enlarged its gas manufacturing plant located at Hempstead-Garden City and to have increased the capacity of that plant to an extent sufficient to supply all of its gas requirements, including gas sold to Long Island Lighting Company." We need not pause to consider whether upon this record the directors of Nassau could have been of the opinion that it was "in a position * * * to have enlarged its plant" if they had made any investigation. We may

assume arguendo that the directors in good faith were of that opinion. It does not appear that *in fact* Nassau could have procured gas from a source other than Queens at or near the price which Nassau had theretofore paid. The defendants maintain, nevertheless, that the price so fixed was a fair price because it was not less than the price which might have been fixed by using what is known as the " increment cost formula ". The testimony of the expert witnesses produced by the defendants that the price fixed is not less than the price would have been if calculated by the " increment cost " method is persuasive and was for the most part accepted by both courts below, but there is no credible evidence that a price fixed by that method would be fair to Queens.

Queens could operate its plant to full capacity if Nassau agreed to buy gas produced there in excess of the amount required by Queens to supply consumers within the territory served by Queens. The average cost of gas when the plant is operated to its full capacity is lower than the average cost of gas when the plant produces gas only sufficient to meet the requirements of Queens as an independent utility corporation. A price for the excess gas fixed in accordance with the " increment cost " formula, even though less than the average cost of producing gas at the Queens plant, would, at least, reimburse Queens for the additional cost of producing such excess gas, and it is said that Queens suffered no loss and, in fact, made a profit by accepting the price so fixed. That is true only if Queens could continue to supply gas to consumers in the territory it served at a price not lower than it could have exacted if the average cost of production of gas at its plant had not been reduced by increased production.

Doubtless, at times, when increased production at a plant reduces the average cost, the producer suffers no loss if he obtains a market for the increased output by selling the increase at a price which though less than the average cost is greater than the additional cost of producing such increase — but the producer must inevitably suffer a loss if he cannot sell the remainder at more than the average cost. The rate at which Queens may sell gas to consumers must be fair and must be approved by the Public Service Commission. The cost of the gas sold is a factor in determining the rate that may be charged.

The trial court found that in fixing a fair rate which Queens might charge for gas supplied to consumers in its "franchise territory", "the general consumers should benefit to some extent, at least, from the savings resulting from the additional business", and that accordingly the average "commodity production cost" should be allocated both to the gas supplied by Queens to general consumers and to the gas produced as an additional service to Nassau, but that "the increment cost method should apply to all the other elements applicable to such additional service". The Trial Justice indicated that in his opinion the record establishes that this method of combination of "average commodity production cost and increment cost" was used by Queens and by the Public Service Commission in calculating the rate which Queens might exact from general consumers in its "franchise territory". If that be true then Queens would inevitably suffer a loss by selling part of the gas it produced at a price fixed by the "increment cost" method and the remainder at a price fixed by the "average commodity production cost" method or combination method, but the Appellate Division reversed findings in favor of the plaintiff in that regard and the defendants contend that there is no evidence in the record to support it.

Whether or not there is evidence in the record which would support a finding that the rate charged by Queens to general consumers was calculated by the "average commodity production cost" method, depends largely upon the construction placed upon language, possibly equivocal, used in colloquy at the trial. For the purposes of this appeal we accept the sense in which counsel for the defense understood these words. Even so it is plain that there is nothing in the record which could possibly justify an inference that Queens would be permitted to exact from general consumers a rate based on more than the average production or commodity cost of gas supplied from its plant. Extracts from the opinion of the Public Service Commission in the case of *Freeport* v. *Nassau & S. Lighting Co.*, (P. U. R., 1924A, p. 96) read into the record upon the cross-examination of a witness, indicate that it is the rule or practice of the Commission to measure the rate which a public utility may charge to general consumers by the average production cost,

and that in a case where the public utility can, at a smaller additional cost, produce additional gas to be supplied in bulk to a single customer, the benefit of the consequent reduction in average cost must be apportioned equitably to the general consumers and the customer purchasing the additional gas. Though that rule or practice is not a formal regulation, adopted and published by the Commission and constituting " a public document or record which this court may consider " (*Matter of Ackerman* v. *Kern*, 281 N. Y. 87, 94), yet we may certainly not assume that the Public Service Commission would approve a rate measured by a different rule. One expert witness did, it is true, testify that during the years 1934 to 1940, inclusive, Queens made a profit of $53,000 upon its sales of gas to Nassau over and above an annual return of 6% on an average investment of more than $900,000. That is a conclusion drawn by the expert based upon his opinion as to the proper adjustments and deductions to be made from the gross profits in determining the amount of the net profit. To analyze this testimony and to point out the uncertain nature of some of the factors entering into the calculation would extend this opinion unduly. Even if accepted in its entirety it would still remain true that a profit of $53,000 in six years on so large a volume of business would hardly justify a board of directors in authorizing the capital investment required, with its consequent risk, particularly if Nassau could at any time terminate the contract and obtain its gas from another source.

A finding by a court of equity that a contract of sale authorized by a board of directors of a corporation is ill advised or causes loss to a corporation would not by itself constitute ground for setting aside the contract and compelling the purchaser to pay a price which the court considers fair. We have said that: " As a general rule, courts have nothing to do with the internal management of business corporations. * * * All questions within the scope of corporate powers which relate to the policy of administration, to the expediency of proposed measures, or to the consideration of contracts, provided it is not so grossly inadequate as to be evidence of fraud, are beyond the province of the courts. The minority directors or stockholders cannot come into court upon allegations of a want of judgment or lack of efficiency on the part of the majority

and change the course of administration." (*Flynn* v. *Brooklyn City R. R. Co.*, 158 N. Y. 493, 507.). Where directors act with undivided loyalty towards the corporation which they direct, their determination that a corporate course of action will promote the interest of the corporation is ordinarily not subject to review by the court, and " errors of judgment by directors do not alone suffice to demonstrate lack of fidelity. That is true even though the errors may be so gross that they may demonstrate the unfitness of the directors to manage the corporate affairs." (*Everett* v. *Phillips*, 288 N. Y. 227, 232.) The test in each case is whether corporate action is the result of the exercise by the directors of their unbiased judgment in determining that such action will promote the corporate interests. We apply that test here.

The directors of Queens intended to exercise an unbiased judgment and in good faith believed that the price fixed by them was fair. Their good faith is established by persuasive evidence and by the findings of the trial court approved by the Appellate Division. So, too, is the fact that the price was fixed after the directors had considered and discussed reports, in regard to the price at which gas should be sold, made by competent engineers and operating experts. But in this case the determination of directors is open to limited review in the courts because neither they nor the experts who prepared the reports were in a position where their loyalty to the interests of Queens was undivided.

We repeat that the directors were elected by Long Island, which owned directly or indirectly the common stock of both Queens and Nassau. A majority of the directors of each corporation were directors of Long Island and several were directors of all three corporations. We are told that though Long Island elected the directors of Queens and of Nassau, it did not usurp the functions of the directors and dominate and control their actions; but concededly all the corporations were operated as part of a " system " and corporate actions of the separate corporations dictated by directors elected by Long Island would inevitably be influenced by that fact. The directors acted upon the advice of experts retained by the system and often after the board of directors of Long Island had approved a proposed policy. That Long Island

selected for the position of director men of ability and integrity and that no officer of Long Island dictated to them what action they should take as directors, does not destroy the significance of these facts. They require the most careful scrutiny of transactions between the corporations represented by common directors, to the end that in the absence of arm's length bargaining the scales may not, even through mistake or inadvertence, be unfairly tipped to one side or the other. Though Long Island in acquiring such control, and even in its exercise within limits imposed by equitable rules, commits no wrong and incurs no liability to Queens, yet where those limits are transgressed to the detriment of Queens, Long Island becomes liable for the consequent damages to Queens and must account for consequent profits to itself. "Power of control carries with it a trust or duty to exercise that power faithfully to promote the corporate interests, and the courts of this State will insist upon scrupulous performance of that duty." (*Everett* v. *Phillips, supra,* p. 232.) Liability arises not from the power of control, but from breach of the duty which accompanies it. (*Blaustein* v. *Pan American Petroleum & Transport Co.,* 293 N. Y. 281.) Here it must be conceded that Long Island and the directors of Queens and of Nassau elected by Long Island sought no personal benefit from the transaction and did not intend to act unfairly towards Queens, and perhaps Long Island obtained no substantial benefit from the inadequacy of the price fixed for gas sold by Queens to Nassau, but the transaction is subjected to judicial scrutiny because the price was fixed by corporate boards having common directors elected by Long Island and these directors had been placed in a position of divided loyalty.

The rule that must be applied in such a situation has been stated by the Supreme Court of the United States. "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in

influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy." (*Geddes* v. *Anaconda Mining Co.*, 254 U. S. 590, 599.) Though the dual position of the directors does not itself render such transactions void, it does make " the unprejudiced exercise of judgment by them more difficult " and " should lead the courts to scrutinize these transactions with care." (*Everett* v. *Phillips, supra,* p. 236.)

The transaction in this case will not bear that scrutiny. The price was fixed upon the basis of reports made by engineers retained by the " system " and these reports are based upon the assumption — which the courts below have agreed is erroneous — that Nassau could expand its plant and manufacture gas for the price it paid to Queens. This erroneous assumption having been accepted as justification of an inadequate price, we cannot doubt that in equity the fixing of a fair price may be required. The defendants have failed to show that the price fixed would not cause a loss to Queens. At best it would make a profit unreasonably small in relation to the volume of the business, the investment of capital and the attendant risk. The proof is insufficient to show justification for the abandonment of the " average production cost " method in calculating the price of gas sold by Queens to Nassau, and the trial court did not err in setting aside the price fixed in 1936 by the " increment cost " method. The Public Service Law (§ 110, subds. 3, 4) confers upon the Public Service Commission jurisdiction to determine whether such an intercompany contract of sale is " not in the public interest," but it does not divest the courts of jurisdiction to determine that it should be set aside on equitable grounds. Since the directors acted in good faith and upon studies prepared by competent engineers, judgment on the merits dismissing the complaint against them is proper.

The question remains whether the trial court's calculation by the " average production cost " method of the price which Nassau should pay is correct. Both sides claim errors there. The controversy involves in large part matters of fact. The Appellate Division, holding that the trial court was not justified in setting aside the price fixed by the directors, has not reviewed the correctness of the calculation of a different price by the

trial court. The case should be remitted to it for that purpose.

The judgment of the Appellate Division dismissing the complaint against the Long Island Lighting Company and Nassau & Suffolk Lighting Company should be reversed, with costs to appellants, and the matter remitted to the Appellate Division. The judgment of the Appellate Division dismissing the complaint against the individual defendants should be affirmed, with costs. (See 293 N. Y. 859.)

LOUGHRAN, RIPPEY, LEWIS, CONWAY, DESMOND and THACHER, JJ., concur.

Judgment accordingly.