Stanley L. KAUFMAN, Dorothy Berkwick, George Berry, Harry Berry, Peter Breingan, Wanda G. Buffoni, Marian S. Campbell, Oliver C. Capper, John R. Cheseldine, Jennie N. Clisset, Isidore Cohen and Rebecca Cohen, Theodore Drazek, Harry W. Ewald and Jessie W. Ewald, Bernard Eisenberg, Earl Freed, John A. Gallik and Mary Claire Gallik, Margaret C. Gilmore, Max Goldstein, Frank A. Graham, Samuel Herrick, Janet M. Hunt, Anna S. Jacobson, Herman Ketcher, Sr., Ernest A. Lemmo, Martha Hazel Lenoir, Agnes Levi, Marion L. Lueck, Louise Malmstrom, George E. Marshall, Mary L. McNamara and Maurice Francis, Michael Miller, Ralph T. Morgan and Crystal Morgan, E. Thomas Neely, Emma Pausa, Cecilia Pitman, Elsie H. Rainey and Joseph P. Rainey, Emily Rice, Oscar Schaefer, Edward Schmidt, Walter C. Schmidt, John M. Schott and Arabella P. Schott, Philip Silberman, J. W. Sparks & Co., Naomi Techentin, Annabell Thomas, Ottille B. Voege, Elsie M. Werk and Elizabeth Wranovics, individually and as Administratrix of the Estate of Ernest Wranovics, deceased, Plaintiffs,

v.

Louis E. WOLFSON, J. A. B. Broadwater, E. B. Gerbert, David A. Goodkind, Robert E. Harvey, Alexander Rittmaster, Edward L. Teale, Cecil Wolfson, Samuel Wolfson, H. W. Pierce, Robert C. Baker, Robert L. Purcell, Doran S. Weinstein, M. F. Bloomenstiel, New York Shipbuilding Corporation and Devoe & Reynolds Company, Inc., Defendants.

United States District Court
S. D. New York.
June 27, 1957.

See also, 137 F.Supp. 479.

Kaufman, Imberman & Taylor, New York City, for plaintiffs, Jacob Imberman, New York City, of counsel, Irwin M. Taylor, New York City, on the brief.

Manning, Hollinger & Shea, New York City, for the individual defendants, William A. Shea, Bruce A. Hecker, and Ralph L. Ellis, New York City, Joseph M. Glickstein, Glickstein, Crenshaw & Glickstein, Jacksonville, Fla., of counsel.

Lawlor & Rockwood, New York City, for defendants New York Shipbuilding Corp. and Devoe & Raynolds Co., Inc.

DIMOCK, District Judge.

Plaintiffs bring this stockholders' derivative action on behalf of New York Shipbuilding Corporation (hereinafter Ship) and Devoe & Raynolds Company, Inc., (hereinafter Devoe) to recover damages alleged to have been sustained because of the conduct of defendants. Plaintiffs alleged eight wrongful acts on the part of defendants. Three of the claims were withdrawn by plaintiffs at the trial, and one was dismissed at the conclusion of plaintiffs' case. There are four claims now before me. The first claim is that defendants diverted to their friends and family an opportunity of Ship to purchase stock. The second claim

is that defendant directors of Ship wasted corporate assets by transferring certain stock to Merritt, Chapman & Scott Corporation (hereinafter Merritt). The third and fourth claims are that defendants gave corporate property away by donating it to a committee to help finance a proxy fight for the control of Montgomery Ward & Co.

### The Corporate Opportunity

In April or May, 1954, Cornelius Shields, an investment banker and a director of Devoe, communicated with E. B. Gerbert, a director of Ship and a defendant in this action, to ascertain whether the "Louis E. Wolfson interests" would be interested in acquiring a controlling interest in Devoe. Mr. Shields had discussed this matter with Mr. Gerbert in 1952, prior to acquisition of control of Ship by the Wolfson interests. No offer materialized from those discussions. On June 2, 1954, Ship submitted a written offer to Mr. Shields to purchase 80,000 shares of Devoe B stock at a price of $30 a share and calling for the resignation of the entire board of directors. Devoe had outstanding two classes of stock, "A" which had the right to elect one-third of Devoe's board of directors, and "B" which had the right to elect two-thirds of Devoe's board of directors. The dividend rights on Devoe B were one-half those of Devoe A. Ship's offer of June 2, 1954 to Mr. Shields lapsed by its own terms. On June 10, 1954, Ship submitted a second offer to six individuals for the purchase of 80,945 shares of Devoe B at $28.50 a share plus $1.50 a share commission to Mr. Shields. The offer required the resignation of eight of Devoe's fifteen directors. This offer was accepted on June 15, 1954. Sometime prior to acceptance of this offer Mr. Shields asked Mr. Gerbert if Ship would be interested in acquiring 25,000 to 30,000 additional shares of Devoe B stock. Mr. Gerbert discussed this offer of additional shares with Alexander Rittmaster, a director of Ship and a defendant in this action. Although no formal action was taken by Ship, the offer was rejected. Mr. Gerbert made efforts to

obtain a purchaser of this additional stock so as to keep it in friendly hands as he says. Ben Yaffee, a friend of defendant Louis E. Wolfson, was approached by Mr. Gerbert, and, on June 17, 1954, the day Ship's purchase of Devoe was made public, purchased 20,000 shares of Devoe B for $22 a share plus commission. On the same day, Mr. Shields, on behalf of certain individuals, sold 15,450 shares of Devoe B on the American Stock Exchange and Mr. Rittmaster purchased 16,900 shares of Devoe B on the American Stock Exchange for himself, his family and his clients. On June 18, 1954, Mr. Shields sold 11,242 shares of Devoe B on the American Stock Exchange, and Mr. Rittmaster purchased 8,900 shares on the American Stock Exchange. Mr. Rittmaster's purchases on June 17 and 18 were at prices ranging from $21.75 to $23.50.

Plaintiffs allege that the offer of 25,000 to 30,000 additional shares of Devoe B was a corporate opportunity of Ship which defendants diverted to themselves. More particularly plaintiffs allege that Mr. Rittmaster diverted the corporate opportunity to himself, his clients and his family and Mr. Gerbert diverted the corporate opportunity to Mr. Yaffee.

The first issue before the court is whether the offer of additional shares was a corporate opportunity. Corporate directors may not use their position of trust and confidence to further their private interests. If there is presented to a director an opportunity in which the corporation has an interest or a reasonable expectancy, and by embracing the opportunity the director's self interest will be brought into conflict with that of his corporation, he may not seize the opportunity for himself.

Was an opportunity of Ship to purchase 25,000 to 30,000 additional shares of a company that it already controlled something that its directors could not lawfully appropriate for themselves? Ship's purchase of 80,945 shares of Devoe B had given it control of the com-

pany. Ship controlled the buying and selling policies of Devoe. Ship controlled the hiring policies of Devoe. These were the items that warranted payment of a premium for the control block. Purchase by Ship of additional shares of Devoe B would in no way affect this control. There was no more reason to purchase more B stock than to purchase any other security of a comparable corporation. Plaintiffs have shown nothing unique about the block of shares that Mr. Shields offered Ship.

In Blaustein v. Pan American Petroleum & Transport Co., 293 N.Y. 281, 56 N.E.2d 705, the court held that the controlling shareholder of Pan American Petroleum & Transport Co. did not appropriate a business opportunity of that company. The court stated, "The lack in the present case is the essential proof that at the time the properties in question were acquired by S O & G they were recognized or identified as properties in which Pan Am had a tangible expectancy —a right which in its nature was inchoate." 293 N.Y. at 300, 56 N.E.2d at page 713. In Lincoln Stores v. Grant, 309 Mass. 417, 34 N.E.2d 704, a director of Lincoln Stores purchased a nearby competing store. The court held that the stock of the competing store was not a corporate opportunity as Lincoln Stores did not have an interest already existing or an expectancy growing out of an existing right nor would the purchase hinder the company. In the case of Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, certiorari denied 294 U.S. 708, 709, 55 S.Ct. 405, 79 L.Ed. 1243, the directors of a corporation had purchased certain patents which the court found to be essential to their corporation. The court held that the directors diverted a corporate opportunity.

Ship did not have any interest or reasonable expectancy in additional shares of Devoe. The purchases of the shares by Mr. Rittmaster and Mr. Yaffee in no way hindered or interfered with the business of the corporation. As the offer was not a corporate opportunity there can be no liability.

## Ship's Transfer of the Control Block of Shares of Devoe to Merritt

Plaintiffs claim that Ship's acceptance of an offer of Merritt to exchange Devoe B stock for shares of Merritt was improper as Ship did not receive any premium for control. The offer by Merritt to acquire the shares of Devoe B was part of an omnibus exchange offer by Merritt to acquire six companies. The companies involved were Ship, Devoe, Tennessee Products Chemical Corporation (hereinafter Tennessee), Newport Steel Corporation (hereinafter Newport), Marion Power Shovel Company (hereinafter Marion), and the Osgood Company (hereinafter Osgood). On November 26, 1954, five months after Ship had purchased control of Devoe, the board of directors of Ship met and appointed a committee of four of its members who were not associated with Merritt to consider Merritt's offer. The committee submitted a favorable report to the board of directors. On December 21, 1954, Merritt filed a preliminary prospectus of the exchange offer with the Securities and Exchange Commission. The Securities and Exchange Commission notified Merritt that it required the prospectus to include a statement of intent on the part of Ship as to whether it would accept the offer. Ship indicated that it intended to do so. On January 27, 1955, Merritt offered every shareholder of Devoe B stock 1⅓ shares of Merritt for each share of Devoe B, and made offers at differing rates of exchange to the holders of Devoe A, Ship, Tennessee, Newport, Marion and Osgood. The rates of exchange bore a very close relation to the relative market prices of Merritt and the other shares involved in the exchange. The offers to the shareholders of Devoe A and B, Tennessee and Ship were conditioned on the acceptance of the offer by at least 80% of the total number of shares in each company. If less than 80% accepted, Merritt reserved the right to put through the exchange with those who did accept. The 80% participation was desired to qualify for

a tax free reorganization. Ship accepted the offer to exchange Merritt shares for Ship's Devoe B shares on condition that 80% of the Devoe A and B shares or 80% of the Ship shares accepted Merritt's offer. Merritt obtained 97% of the outstanding shares of Devoe B and 86% of the outstanding shares of Devoe A. Several months later, in July, 1955, Merritt renewed the exchange offer at the same rates. After this offer Merritt had obtained 99.8% of the outstanding shares of Devoe B and 94.3% of the outstanding shares of Devoe A.

Plaintiffs allege that the individual defendants violated a fiduciary duty to Ship when they transferred Devoe B shares to Merritt without obtaining adequate consideration for the control factor. Plaintiffs rely on two facts to prove that the exchange was not fair to Merritt: first, that Ship and Merritt had six directors that were common to both boards and, second, that Ship received the same amount per share for its control block of 80,945 shares of Devoe B as did every other shareholder of Devoe B.

■ It is to be noted that plaintiffs are not suing to rescind the transaction, but are attempting to charge the directors with individual liability. The courts of New York have applied to suits for rescission a standard different from that applied to suits to hold a director individually liable. Chelrob, Inc., v. Barrett, 293 N.Y. 442, 461, 57 N.E.2d 825. Furthermore the charter of Ship specifically provides that the directors may vote in a transaction in which they are interested. In view of these circumstances the burden is on plaintiff to come forward with some evidence that the exchange was not fair to Ship. Ewen v. Peoria & E. Ry. Co., D.C.S.D.N.Y., 78 F.Supp. 312, certiorari denied Income Bondholders of the Peoria & Eastern R. Co. v. New York Central R. Co., 336 U.S. 919, 69 S.Ct. 642, 93 L.Ed. 1032.

■ It seems to me that this evidence has been furnished. We must look at the transaction from the standpoint of a minority shareholder in Ship. He had an aliquot interest in a controlling block of Devoe B. Only seven months before, that had been purchased at a premium in the order of a million dollars over the market price. The directors exchanged that block for a block of Merritt stock at the same ratio at which non-controlling blocks of Devoe B were exchanged for Merritt stock. Either Ship was underpaid for its controlling block or the other holders were overpaid for their smaller blocks. That Ship was underpaid appears from the fact that all of the stocks absorbed by Merritt were taken in at a ratio with Merritt stock just high enough, in relation to relative market values, to make it worth while for the holders of stock of the absorbed companies to exchange their stock for Merritt stock. Ship, as holder of the controlling block of Devoe B, was paid in Merritt stock the same dollar or so in premium over the market price of Devoe that all other holders of stock in Devoe and the other absorbed companies were paid.

The directors of Ship thus turned over the Devoe B stock at an inadequate price. To a stockholder in Ship who exchanged his Ship stock for Merritt stock this perhaps made no difference since Merritt got the benefit of the bargain and the exchanging stockholder shared in the benefit. A Ship stockholder like the plaintiffs, however, irrevocably lost his share in the premium value of the control block and received no compensating advantage.

■ A valuable asset of Ship was thus taken from Ship and turned over to Merritt in a transaction set in motion by directors some of whom held that office both in Ship and in Merritt. The transaction is thus voidable at the suit of Ship but that is not the relief the plaintiffs seek. Plaintiffs seek to hold the interlocking directors personally liable. To establish such a claim plaintiffs must show that the directors acted in bad faith, Chelrob, Inc., v. Barrett, 293 N.Y. 442, 57 N.E.2d 825, supra, or at least

reaped a personal profit, Marian v. Mariani, 276 App.Div. 205, 93 N.Y.S.2d 370.

In this case there is no evidence of bad faith on the part of the interlocking directors. The transaction was no part of any deliberate scheme to defraud Ship and its stockholders. Indeed, the thought that the effect of the transaction was to injure minority stockholders of Ship never occurred to counsel for plaintiffs in this case until just before the trial began.

■ Plaintiffs say that, because defendants were stockholders in Merritt, they realized a profit from the transfer of the control shares of Devoe B to Merritt. No attempt was made, however, to show the maximum amount by which the defendant stockholders in Merritt could have profited. Until that has been done, defendants are under no burden to show that they did not profit. See Stella v. Graham-Paige Motors Corporation, 2 Cir., 232 F.2d 299, 302.

All of the interlocking directors were shareholders in Ship as well as in Merritt. There was thus presumably no financial profit for them from the transfer of the control block from Ship to Merritt. They shared in its value before the transfer and shared in it afterwards.

Plaintiffs cite as the motive of Louis E. Wolfson for participating in the transaction the fact that the Wolfson interests would increase their percentage of the stock of Merritt from 3.9% to 5.2% as a result of it.

The Merritt stock of the Wolfson interests, so called, before the transaction was distributed as follows:

| | | |
|---|---:|---|
| Louis E. Wolfson owned beneficially | 58,861 | shares |
| His wife owned beneficially | 4,560 | " |
| Trusts of which Mr. Wolfson's children were beneficiaries held | 2,104 | " |
| Mr. Wolfson's brothers, The Wolfson Family Foundation, Foundation Associates, Louis E. Wolfson and his brothers as Trustees and other members of the Wolfson family held | 18,710 | " |
| or a total of | 84,235 | shares |

As of the close of the transaction

| | | |
|---|---:|---|
| Louis E. Wolfson owned beneficially | 117,628 | shares |
| His wife owned beneficially | 6,360 | " |
| Trusts in which Mr. Wolfson's children were beneficiaries held | 4,772 | " |
| Mr. Wolfson's brothers, The Wolfson Family Foundation, Foundation Associates, Louis E. Wolfson and his brothers as Trustees and other members of the Wolfson family held | 129,312 | " |
| or a total of | 258,072 | shares |

It is interesting to note that by the transaction the percentage of stock of Merritt held by Louis E. Wolfson, his wife and the trustees for his children decreased from 3% to 2.6%, although the holdings of the so-called Wolfson interests increased from 3.9% to 5.2%.

■ Plaintiffs point out that the Wolfson interests thus solidified the control of Merritt which they already possessed. We are here concerned, however, with personal profit rather than motive and, unless the interlocking directors profited by the transaction, they are not liable. The increase in the percentage of control may have made members of the Wolfson group feel easier in their minds but the question is not their motive but their profit.

Plaintiffs do not contend that, by virtue of the increase in the Wolfson holdings from 3.9% to 5.2%, control of Merritt was obtained. The most that they contend is that an existing control was solidified. The only possible profit to the Wolfson interests would thus be in the greater value of a 5.2% block than a 3.9% block for control purposes. If this claim has any basis it must mean that a 5.2% block would sell at a greater price per share than a 3.9% block.

Since we know nothing of the influence that Louis E. Wolfson may have had over the disposition of any of the Merritt stock, it is impossible to say that he profited financially from the increase in the size of the control block from 3.9% to 5.2%. There is no evidence that Louis E. Wolfson would have been able to deliver a block larger than 2.6%.

■ I thus conclude that there is no evidence that any of the interlocking directors profited by the transfer of the control block of Devoe B stock from Ship to Merritt and the claim against the directors based upon the transfer of this block is therefore dismissed.

### The Contributions to the Wolfson-Montgomery Ward Stockholders Committee

In August 1954, Louis E. Wolfson and his associates became interested in challenging the management of Montgomery Ward (hereinafter Ward) in the election of directors to be held April 22, 1955. The Wolfson-Montgomery Ward Stockholders Committee (hereinafter Committee) was formed to support the proxy fight. Devoe purchased 40,000 shares of Ward during the period from August 23, 1954 to October 13, 1954. Ship purchased 6,000 shares of Ward during the period from November 18, 1954 to December 14, 1954. On February 16, 1955, Devoe's board of directors authorized payment of $40,000 to the Committee to help finance the proxy fight. On April 18, 1955, Devoe paid the Com-

mittee $60,000. On April 19, 1955, Ship paid the Committee $10,000. Both Ship and Devoe voted their shares for the Wolfson slate of directors on April 22, 1955. Three directors of the Wolfson slate were elected to the Ward board; the old management continued in control, however. On May 2, 1955, the board of directors of Devoe ratified the payment of the additional $20,000 to the Committee. On the same day Ship's board ratified the payment of $10,000 to the Committee.

Ship sold its Ward stock on May 23, 1955 at a net profit of $12,215.87. Devoe sold its Ward stock during the period from July 1, 1955 to October 20, 1955 at a net profit of $168,456.27.

Plaintiffs allege that the payments to the Committee were ultra vires and a waste of corporate monies. Defendants claim that the payments were made to further the reasonable business interests of Ship and Devoe.

■ I can find no fault with the purchases of Ward stock. While I cannot shut my eyes to the fact that it was purchased as part of a campaign to put Louis E. Wolfson in control of Ward, the purchasing corporations, Ship and Devoe, had selfish business interest in unseating the Ward management and installing one that would buy their products. There was some testimony that the Ward stock was bought for investment and I accept it to the extent of finding that its investment value was one of the reasons for its purchase. Ship and Devoe directed one of their legitimate business functions, investment, into a channel which would feed another of their legitimate business functions, selling goods.

I cannot say so much, however, for the contributions to the Committee. The legitimate business function of selling goods was there but contributing to partisans in other people's proxy fights is not a legitimate business function. Instead of being investment, it is speculation or worse. If the proxy battle is lost

**260**

the contribution is lost. The very difficulty that the courts have in sanctioning the use of funds of corporations for their own proxy fights demonstrates the impossibility of sanctioning such use to subsidize others. See Rosenfeld v. Fairchild Engine & Airplane Corp., 309 N.Y. 168, 128 N.E.2d 291.

Defendants point, however, to the profits made upon the investment in the Ward stock and say that, if the contributions were unlawful, stock purchases and contributions were all part of the same breach of trust and, since the composite breach resulted in a net profit, plaintiffs have no complaint.

The difficulty with that is that the stock purchases, whether or not connected with the contributions, were not made in breach of trust. They were legitimate investments and Ship and Devoe are entitled to all of the profits therefrom without diminution to make up for unlawful diversions by their directors in breach of trust.

Plaintiffs say that the profits on the transactions in the Ward stock were enhanced as a result of the contributions to the Committee. They say that the agitation by the Committee, even though unsuccessful in getting control for Louis E. Wolfson, created the rise in the market value of the stock. I do not need to decide whether the wrongdoers ought to be allowed to set off the amount of the contributions against the amount of the profit under such circumstances. There is no credible evidence that the activities of the Committee had anything to do with the rise in the market price which enabled the corporations to make a profit on the Ward stock.

Plaintiffs are entitled to judgment to be submitted by counsel directing that defendants restore to Ship and Devoe the amounts contributed to the Committee with interest from April 19, and April 18, 1955, respectively.