MARGARET ESPACH and Others, Suing upon Their Own Behalf as Stockholders, and for the Benefit of All Other Stockholders of the NASSAU & SUFFOLK LIGHTING COMPANY Similarly Situated, Plaintiffs, *v.* NASSAU & SUFFOLK LIGHTING COMPANY and Others, Defendants.

CHELROB, INC., B. ARNOLD CHAMBERS and MARY FRIES, Suing upon Their Own Behalf and on Behalf of All Other Stockholders of QUEENS BOROUGH GAS & ELECTRIC COMPANY Similarly Situated, Who May Join in This Action and Contribute to the Expense Thereof, Plaintiffs, *v.* EDWARD F. BARRETT and Others, Defendants.

Supreme Court, Nassau County, November 5, 1941.

*Milton Pinkus* and *Emanuel Rackman,* for the plaintiff Margaret Espach.

*Menden & Mann,* for the plaintiff Max Singer.

*Kahn & Unger,* for the plaintiff Daisy Weisel.

*C. Walter Randall* [*Percival E. Jackson* and *Theodore N. Tarlan* of counsel], for the plaintiffs, intervenors, Julia S. Villard and Oswald Garrison Villard.

*Michael E. Berman,* for the plaintiff, intervenor, Anna E. Bahruth.

*Harry Tabershaw* and *Robert C. Richter* [*Percival E. Jackson* and *C. Walter Randall* of counsel], for the plaintiff Chelrob, Inc.

*Joseph A. Ruskay* [*Walter R. Hart* and *Milton Paulson* of counsel], for the plaintiff B. Arnold Chambers.

*Edwin V. Hellawell* [*Fletcher Martin* of counsel], for the plaintiff Mary Fries.

*Charles G. Blakeslee* [*Charles G. Blakeslee* and *John J. Donohuc* of counsel], for the defendants Long Island Lighting Company, Edward F. Barrett, James W. Carpenter, Lewis A. Howland, Charles G. Blakeslee and Franklin S. Koons.

*Callaghan, Stout & Nova* [*Stephen Callaghan, Ralph Stout* and *Thomas A. Gaffney* of counsel], for the defendants Ellis L. Phillips, E. L. Phillips & Co., Henry R. Frost, John A. McKenna, Robert G. Olmsted, Edward L. Davies, Empire Power Corporation and Hugh M. Pierce.

*Griggs, Baldwin & Baldwin* [*Alfred P. Hamel* of counsel], for the defendants Queens Borough Gas & Electric Company and Long Beach Gas Company, Inc.

*Edward J. Crummey*, for the defendants Nassau & Suffolk Lighting Company and E. J. Crummey.

*Elmer B. Sanford*, in person.

*Mc Kercher & Link* [*George Link, Jr.*, of counsel], for the defendant Eversley Childs.

*Huntington & Hill* [*David S. Hill, Jr.*, of counsel], for the defendant Fred H. Maidment.

*Seibert & Riggs* [*H. Preston Coursen* of counsel], for the defendant William C. Langley.

McGAREY, J. These are consolidated stockholders' derivative actions instituted by preferred stockholders of Queens Borough Gas & Electric Company and Nassau & Suffolk Lighting Company on behalf of these corporations. The defendants are Long Island Lighting Company, Nassau & Suffolk Lighting Company, Queens Borough Gas & Electric Company, the directors of all three corporations, E. L. Phillips & Co., and Empire Power Corporation. The only remaining defendants are the three corporations, viz., Long Island Lighting Company, Nassau & Suffolk Lighting Company and Queens Borough Gas & Electric Company, the actions having been discontinued, dismissed or dismissed without prejudice against the other defendants.

The plaintiffs on behalf of their corporations seek an accounting of profits claimed to have been improperly made by the Long Island Lighting Company and the Nassau & Suffolk Lighting Company,

and to recover losses sustained by the Queens Borough Gas & Electric Company and the Nassau & Suffolk Lighting Company based upon inter-company sales of gas. The three companies are all part of what is known as the Long Island Lighting System, of which the Long Island Lighting Company is the parent or dominant corporation. It owns the common stock of Queens Borough Gas & Electric Company which in turn owns the common stock of Nassau & Suffolk Lighting Company. Preferred stock of each company is outstanding in the hands of the public.

Prior to 1923 the three companies operated independently. About that time Long Island acquired all the common stock of Queens Borough. In 1927 and prior thereto Nassau & Suffolk furnished from its own plant all the gas needed for its own franchise territory as well as that of Public Service Corporation of Long Island and Long Beach Gas Company, which companies were owned by the same interests as then owned Nassau & Suffolk. Public Service served what was known throughout the trial and what is generally known as Northern Nassau territory. Neither Public Service nor Long Beach had any gas manufacturing plant nor has either of them a gas manufacturing plant now. In 1927 Queens Borough acquired the common stock of Nassau & Suffolk and of Long Beach, and Long Island Lighting acquired the common stock of Public Service, and in 1930 Public Service was merged into and consolidated with Long Island Lighting, thereafter ceasing to operate. In addition to Public Service there was in the Northern Nassau territory a small, independent company known as Sea Cliff & Glen Cove, which was also acquired by and merged with Long Island Lighting. It had a small gas manufacturing plant which was antiquated. In 1927 Nassau & Suffolk furnished from its own plant all the gas needed for its own franchise territory as well as that of Northern Nassau, but its plant was inadequate. There were complaints as to quality of gas, and it not only did not have the financial resources but there was public opposition to the expansion of its gas plant. To meet the demands it was necessary to operate all facilities three shifts a day, leaving no opportunity for shut-down, break-down or repairs. It had little, if any, reserve capacity for manufacturing and storage. There were conflicting franchise territory claims between Nassau & Suffolk and Queens Borough. Queens Borough at that time had an excess capacity and its plant was more modern and efficient than that of Nassau & Suffolk, and it had a lower commodity production cost. Its plant was located at Tidewater, on Jamaica Bay, at Rockaway Park.

After acquisition of Long Beach and Nassau & Suffolk by Queens Borough, Long Beach was serviced by a line running through Atlan-

tic Beach and thence into Long Beach. After acquisition of Nassau & Suffolk by Queens Borough, Nassau & Suffolk production was reduced and it purchased its excess requirements from Queens Borough, the latter having increased its facilities by adding a new gas set at Rockaway Park and a large storage holder at Inwood. At or about the same time the Long Island gas manufacturing plant at Bay Shore, the Queens Borough plant at Rockaway Park and the Nassau & Suffolk plant at Hempstead were interconnected. It is the court's opinion that these interconnections and the sale of the excess requirements of Nassau & Suffolk by Queens Borough constituted good sound business policy on the part of the respective companies. The interconnections insured each company of a supply in the case of any emergency and thereby benefited the general consumers. The purchase of Nassau & Suffolk's excess requirements from Queens Borough meant that the full facilities of Queens Borough could be more completely utilized, and the strain lifted from the Nassau & Suffolk production and distributing systems which, as above stated, were antiquated and inadequate. The maximum peak demand of Queens Borough's own requirements was during the summer months whereas that of Nassau & Suffolk, including Northern Nassau, was during the winter months. The new arrangement provided for a more uniform peak demand on Queens Borough's facilities and eliminated the overtaxing of the facilities of Nassau & Suffolk.

It is apparent to the court that in fixing the price at which Queens Borough sold to Nassau & Suffolk the problem was considered from the viewpoint of the system as a whole without regard to the effect on the individual companies, it obviously having been the hope and the desire of the directors and everybody concerned to provide for a merger of all the constituent companies into one company as well as one system. However, this was apparently delayed or prevented with the advent and continuance of the depression of the '30s. The advantages and benefits to the system as a whole, however, may not be availed of so as to cause a financial loss to any of the individual companies. It is apparent to the court from the testimony that the directors endeavored to fix the price of the gas sold by Queens Borough to Nassau & Suffolk at the cost to Queens Borough of the additional business. While such may have been the intention the results show that the price received by Queens Borough was less than the cost of this additional business with a fair return on the facilities and capital devoted exclusively to that service as hereinafter stated.

The court has found that Long Island dominated and controlled its subsidiary corporations in all of their intercompany transactions.

A substantial majority of the common stock, the only voting stock of Long Island, was owned or controlled, directly or indirectly, by three individuals or their families. By reason of that control and the ownership by Queens Borough of the common stock of Nassau & Suffolk, the Long Island Company was in a position to and did dictate the election of all the directors of the various companies and, in turn, the election of their officers. Some of the directors were on the board of only one company whereas others were on the boards of two or all of the companies. The legal principles applicable to the corporate situation presented here by this system of control of the voting stock of the dominant corporation and the interlocking directorates of the subsidiary corporations are neither novel nor unsettled. The decisions of the courts have been uniform in this jurisdiction as well as others that where one corporation or individual or group of corporations or individuals, through stock ownership or other devices without stock ownership, dominated or controlled another corporation or corporations, the dominating forces occupy a fiduciary relationship to the minority or other public security holders, and their intercompany acts must be fair and reasonable; otherwise, they must respond for any losses or damages sustained by reason of the improper exercise of such domination and control, and account for any of the profits improperly received. When domination and control are established, the propriety of the action or inaction must be demonstrated by the dominating power, as in the case of all transactions between a fiduciary and beneficiary.

At the conclusion of the testimony, the court held that the plaintiffs had shown domination and control, and, therefore, were entitled to an accounting. It felt, however, that a separate accounting would be unduly onerous and expensive to the companies as well as to the plaintiffs and could be obviated because all of the necessary data for such accounting was already in the record, and the court continued the cause to give the parties an opportunity to offer any additional proof necessary or desirable in connection with the accounting.

Upon all the testimony and after taking the accounting, it is the opinion of the court that in only one respect did the intercompany acts and transactions fail to meet the rigid requirements imposed by law, and that is with respect to the price fixed for the sale of gas by Queens Borough to Nassau & Suffolk.

To determine a fair and proper price for the intercompany sale of gas would be such price as one company under independent management would charge another additional wholesale customer, to whom it was under no legal obligation to sell. The primary purpose and

obligation of a utility company are to serve its general consumers in its franchise area. If it has an excess capacity and is in a position to sell gas to others to whom it is under no legal obligation, by franchise, to sell, sound business policy requires that such sale be based upon the additional or increment cost, including the additional cost of production, transmission and depreciation of facilities used, as well as a return on the additional capital and facilities used exclusively for the new or additional business. In this case, however, the average cost should be used rather than the increment cost with respect to the element of commodity production cost, as distinguished from the other elements entering into the cost of the additional business. The companies themselves, in the various rate schedules filed with the Public Service Commission and in the various rate proceedings before such Commission involving their general consumers, used the average commodity production cost method in justifying the rates which were in effect or which they sought to have adopted. Having done this, the application of the increment commodity production cost method to the additiona' business would result in a loss to the Queens Borough Company because it would not recover from the combined general consumer business and additional intercompany business its total commodity production cost, and it would, therefore, suffer a loss in respect to the additional company business in the amount of the difference between the sum represented by the average commodity production cost and the increment commodity production cost. To that extent the amount paid by Nassau & Suffolk to Queens Borough was less than a fair price and Queens Borough is entitled to recoup that amount from Nassau & Suffolk. Had the commodity production cost under independent operation been used in fixing the commodity cost of gas to the general consumers, justification might exist for the full and complete use of the increment cost method to the additional business. Having failed so to do, the court must use a combination of the average commodity production cost method as to the other elements of additional business. In any event the court believes that where a utility company has an excess capacity and it sells additional gas to others, to whom it is under no obligation to give service, then the average commodity cost should be applied to the sale of the additional amount manufactured and distributed because the general consumers should benefit to some extent, at least, from the savings resulting from the additional business; but that over and above the commodity production cost, the increment cost method should apply to all the other elements applicable to such additional service, including depreciation or retirement, or both, of

the plant used exclusively for that service or the portion of it used exclusively for that service, the maintenance of the property used exclusively or the maintenance of the portion of the property used exclusively for that service, the cost of transmission and pumping, taxes applicable to the additional business, any supervision or clerical service incident to the additional business, and a reasonable return on the amount of the property or the portion thereof devoted exclusively to that service.

Applying the above method, i. e., average commodity production cost and increment cost as to all other elements, the court finds that Queens Borough was damaged by the sale of the gas to Nassau & Suffolk under the compulsion of its dominating force, Long Island, at a price less than a fair price to cover all of its additional costs, inclusive of a six per cent return on the additional capital and property used for that service, and it is, therefore, entitled to a judgment in the sum of $387,020, representing the difference between what it should have received as a fair price and what it was actually paid.

While the additional cost method is the lower limit of a fair price for intercompany transactions, the upper limit—which is the maximum amount which the purchasing corporation should pay—is and should be the amount which it would have cost the purchasing corporation to have produced the gas itself or to have purchased it from another source; but under the circumstances disclosed in this case, the ability of Nassau & Suffolk to have produced the gas purchased by it from Queens Borough or to have purchased it from another source is no justification for Queens Borough's selling below cost at a loss to itself. Under independent operation it would not have done so. This upper limit, however, is not applicable under the facts disclosed in this case. It is theoretical rather than practical because Nassau & Suffolk during the greater portion of the period involved was not in a position to expand its facilities or to have secured the necessary permits from the proper authorities to overcome zoning restrictions and public opposition to the expansion of its facilities. The court has made no allowance for a return on the value of the land used by Gas Set No. 5. The land in question is a small portion of a large plot completely bounded by other parts of property owned and utilized by Queens Borough for many years prior to its dealings with Nassau & Suffolk, and if the additional business were not used, it would still have been required to maintain that property; in any event, the amount involved would have little bearing on the final result.

Another element of cost which the plaintiffs urged but which the court has not adopted is the item of general and administration

expenses. While under certain conditions this item would be properly included under the additional cost theory, in this case the evidence clearly indicates that none of the services of any of the personnel could be dispensed with if any of the intercompany business were discontinued and that no additional expenses for these purposes exist by reason thereof.

With respect to the claims urged on behalf of Nassau & Suffolk against Long Island as to the price of gas sold by Nassau & Suffolk to Long Island, the court finds that Nassau & Suffolk suffered no loss by reason of such sales and the price paid was adequate and covered all elements entering into the cost, even using the price which the court has found that Nassau & Suffolk should have paid to Queens Borough. Furthermore, this price was less than the amount it would have cost Long Island to have supplied the Northern Nassau territory either from its own plant at Bay Shore or from an independent plant in the Northern Nassau territory.

In two of the years under consideration there were retroactive price reductions. The intercompany sales were governed by contracts. The usual period was from April first of one year to April first of the following year, but the contracts were to continue in full force until modified or canceled. In the years 1938–1939 no new contracts were prepared as of April first and it was some time later that the new prices were fixed and when they were the modification was made effective as of the preceding April first. These reductions in price or modifications were in writing and, therefore, as between corporations acting independently and not under the persuasion of a dominant control, would require no independent consideration. The court believes that under the facts disclosed by the record these retroactive modifications were proper and would have been made were there no domination or control. They were consistent with the uniform practice of having the prices for intercompany sales effective as of April first.

The court, therefore, holds that Nassau & Suffolk is not entitled to any recovery for any inadequacy of the price it received from Long Island for the sales of gas to it by Nassau & Suffolk.

The plaintiffs are not entitled to interest as a matter of right under section 480 of the Civil Practice Act, but they are entitled to interest in the discretion of the court. The plaintiffs having failed to establish any actual fraud or bad faith, but the recovery herein being due to the failure of the defendants to properly compute the price for the sale of gas by Queens Borough to Nassau & Suffolk, the interest rate is limited to two per cent per annum, to be computed from December thirty-first of each year on the balance then due to the date of the entry of judgment.

The judgment shall be against Long Island Lighting Company and Nassau & Suffolk Lighting Company, with the direction that as between Nassau & Suffolk and Long Island the judgment shall be paid by Nassau & Suffolk Lighting Company. The damage to Queens Borough Gas & Electric Company was caused by the improper exercise by Long Island Lighting Company of its domination and control, resulting in the unjust enrichment of Nassau & Suffolk Lighting Company. Long Island Lighting Company itself did not benefit. Nassau & Suffolk Lighting Company was the only one that did; therefore, it should be the one to bear the burden of this judgment.

Submit judgment and any additional findings desired on notice to all parties.