In re LONG ISLAND LIGHTING CO. et al.
Civ. No. 10413.

United States District Court
E. D. New York.

Feb. 10, 1950.

Affirmed in Part June 1, 1950.

Harry G. Slater, Chief Counsel, Division of Public Utilities, and Solomon Freedman, Washington, D. C., for Securities & Exchange Commission.

Charles G. Blakeslee, General Counsel, and David K. Kadane, New York City, for applicant companies, Long Island Lighting Co., Queens Borough Gas & Electric Co., and Nassau & Suffolk Lighting Co.

Harold G. Aron, Washington, D. C., Lynne A. Warren and Charles B. McGroddy, Jr., New York City, for Common Stockholders' Committee of Long Island Lighting Co.

Percival E. Jackson, New York City, for Langley Preferred Stockholders' Group.

McLaughlin & Stern, New York City, for certain holders of the preferred stock of Nassau & Suffolk Lighting Co. (Stephen S. Bernstein, New York City, of counsel).

Boehm & Fischman, New York City, for Protective Committee for Holders of Queens Borough Gas & Electric Co. Preferred Stock (Bernard D. Fischman, New York City, of counsel).

Graustein & Kormendi, New York City, for Louis W. Gordon, owner of 50,000 shares of the Common Stock of Long Island Lighting Co. (Laszlo Kormendi, New York City, of counsel).

Milton Pollack, New York City, for Long Island Preferred Stockholders' Committee.

Maurice B. & Daniel W. Blumenthal, New York City, for Common Stockholders (Daniel Blumenthal, New York City, of counsel).

KENNEDY, District Judge.

This is a proceeding in which the petitioner prays for an order enforcing and carrying out the terms and provisions of an amended plan, subsequently modified, for the consolidation and recapitalization of three utility companies operating on Long Island. The companies are: (1) the Long Island Lighting Company (called Long Island), (2) its wholly owned subsidiary Queens Borough Gas and Electric Company (called Queens), and (3) the latter's wholly owned subsidiary Nassau and Suffolk Lighting Company (called Nassau). The plan was filed under Public Utility Holding Company Act of 1935, § 11(e), 15 U.S.C.A. § 79 et seq., called the Act.

Corporations Involved.

Long Island was incorporated on December 31, 1910 under the Transportation Corporations Law to produce, purchase and sell electricity. It is engaged in the generation and purchase of electric energy, the manufacture and purchase of gas, and the sale and distribution thereof for light, heat and power to consumers in the counties of Nassau and Suffolk, on Long Island, in the State of New York. It is a public utility company as defined in sec. 2(a) (5) of the Act and is a holding company within the meaning of sec. 2(a) (7) of the same statute. As of March 31, 1949, its outstanding securities were as follows: first mortgage bonds, $42,035,000; sinking fund debentures, $5,974,000; notes payable to banks, $10,000,000; 7% cumulative preferred stock (74,750 shares) having a par

value of $100; 6% cumulative preferred stock (179,050 shares) having a par value of $100; and common stock (3,000,000 shares) with no par value, but having a stated value of $1 per share. The two series of preferred stock having priority over the common stock as to cumulative dividends and upon dissolution, voluntary or involuntary, they are entitled to receive par value plus all accumulated dividends. These preferred shares are redeemable, in whole or in part, at 110% of their par value plus accumulated dividends. Long Island has not met its full preferred dividend requirements since 1936. As of March 31, 1949 (forgetting what I shall later call the "1944 plan") arrears were on the books at $77 per share on the 7% series ($17,573,050) and $66 per share on the 6% series. There have been no dividends on the common stock since 1933. Despite its arrearages the preferred stock does not vote in the election of directors.

Queens, a public utility corporation, was incorporated on December 31, 1910 under New York law. It generates and buys electric energy, manufactures gas, and sells and distributes it for light, heat and power to consumers in the Borough of Queens, City of New York, and in Nassau County, Long Island. On March 31, 1949, its outstanding securities were as follows: bonds, $10,858,000; debentures, $3,393,000; notes payable to banks, $1,500,000; 6% cumulative preferred stock (66,860 shares), having a par value of $100; and common stock (200,000 shares) having no par value, but a stated value of $10 per share. The preferred stock has priority over the common stock as to cumulative dividends and is entitled to receive, in the event of liquidation or dissolution, voluntary or involuntary, par value plus accumulated dividends. That same stock is redeemable in whole or in part at 110% of its value plus accumulated dividends. Full preferred dividend requirements have not been paid since 1936. No dividends have been paid on the common stock since 1933. The dividend arrears on the preferred stock as of March 31, 1949 amounted to $67.50 per share ($4,513,050). The preferred stock does not vote in the election of directors.

Nassau, a public utility corporation, was organized May 13, 1905, under the New York law. It manufactures and buys gas and sells and distributes it to consumers in Nassau County. It also engages in the purchase and sale of electricity to consumers in the same county. As of March 31, 1949, its outstanding securities were as follows: first mortgage bonds, $2,820,000; face value of notes payable to banks, $700,000; 7% cumulative preferred stock (27,262 shares) having a par value of $100; common stock (10,000 shares) having a par value of $100. The preferred stock has a priority over the common stock as to cumulative dividends, and, on dissolution, it is entitled to receive par value plus accumulated dividends. That preferred stock is redeemable at $112 per share plus accumulated dividends. Nassau has not met its full preferred dividend requirements since 1933, and no dividends have been declared on the common stock since the same year. The dividend arrearage on the preferred stock as of March 31, 1949 was $94.75 per share ($2,583,074.50).

The three companies, together with Long Beach Gas Company, Inc. (Long Beach) are and have been operated with respect both to gas and electric service as a single co-ordinated unit. The electric properties are interconnected by high voltage transmission lines. Long Island buys and sells electricity to Queens; Queens supplies Nassau with all its electric requirements. All the gas properties of the companies are interconnected by high pressure transmission mains. Long Beach gets its gas requirements from Queens and so does Nassau. Moreover, Nassau and Long Island sell gas to each other.

The foregoing facts have been taken from the petition in part, and in part from Holding Company Act Release No. 9473 dated November 2, 1949 (the findings and opinions of the commission on the amended plan submitted by the companies). To a very large extent I have merely set forth these facts in the very same words used in the documents mentioned. They do, however, reflect four very significant indisputable features of the present condition of the companies, namely: (1) that

all three are hopelessly in arrears to the preferred stockholders, (2) that all three are dominated and controlled by the common stock alone, (3) that all three are so interconnected physically, as well as otherwise, that the feasibility of consolidation is apparent, and (4) that the necessity for recapitalization and reorganization is pressing.

### History of Administrative Proceedings.

But before discussing the specific plan which I am asked to enforce it will, I think, be helpful if I mention, even briefly, the history of the efforts which have been made to evolve a remedy for this condition.

Prior to April 21, 1945, Long Island was not under the jurisdiction of the commission: it and each of its subsidiary companies had received an exemption. On December 16, 1944, Long Island filed in the office of the Secretary of the State of New York, with the approval of the Public Service Commission of the State of New York (the state commission) a certificate of reduction of capital to revise the rights and privileges of its stockholders. Certain journal entries were to be made in the books, as ordered by the state commission, and the par value of the outstanding 253,-800 shares of preferred stock was to be reduced from $100 to $60 per share. The accumulated dividends as of June 30, 1944 were to remain unaffected. The outstanding 3,000,000 shares of common stock were to be cancelled and in lieu of outstanding stock the company was to issue 503,800 shares of new common stock to the preferred and common stockholders on the basis of one share of new common stock for each share of preferred stock and each 12 shares of common stock. No dividends on the common stock were to be paid until all preferred stock arrearage had been met, and the unearned surplus arising from the reduction in capital and the elimination of paid-in premiums together with existing unearned and earned surplus at June 30, 1940 was to be used to increase the depreciation reserve by $6,000,000 and to provide $4,979,320, as a "special reserve for depreciation" and for loss in value of investments. Almost simultaneously with the filing of the plan petitioner, the Securities and Exchange Commission (the federal commission) brought a proceeding in the Eastern District of New York to enjoin any further action, pending an effort by the federal commission to cancel the exemption theretofor granted Long Island and its subsidiaries. This application I denied, Securities and Exchange Commission v. Long Island Lighting Co., D.C.E.D. N.Y.1944, 59 F.Supp. 610, affirmed 2 Cir., 1945, 148 F.2d 252, judgment vacated and remanded to the district court with directions to dismiss the complaint on the ground that the cause had become moot, 1945, 325 U.S. 833, 65 S.Ct. 1085, 89 L.Ed. 1961. These proceedings to cancel the exemption became moot because on April 21, 1945, the federal commission then terminated the exemption with respect to certain sections of the Act including secs. 11(b) (2) and 11(e). On April 23, 1945, Long Island filed a notice of registration with the federal commission. In the meantime, the 1944 plan filed with the state commission had never become operative. None of the accounting entries were made; none of the certificates were issued.

On October 25, 1945, Long Island filed under sec. 11(e) of the Act a petition for consolidation and recapitalization involving Long Island, Queens, Nassau and Long Beach. On the following day (October 26, 1945) the same four companies filed with the state commission a joint petition for permission and approval to consolidate, to exercise the franchise through the consolidated company, and to issue 101,520 shares of preferred stock 4% series, and 1,059,036-3/10ths shares of common stock without par value. On November 9, 1945, the federal commission instituted proceedings under sec. 11(b) (2) of the Act, directed against all four companies, in order to determine whether voting power was unfairly and inequitably distributed among the security holders. There was a consolidation of the proceedings before the federal commission; that is, the proceeding under sec. 11(e) to consolidate and recapitalize, and the proceeding under sec. 11(b) (2) to determine the question of inequitable distribution of voting power.

On September 24, 1947 the state commission issued a memorandum suggesting that Long Beach be eliminated from the consolidation and that the consolidated corporation have outstanding only one class of stock, namely, common stock. On February 7, 1948, an amended petition was filed with the state commission, and on March 10, 1948, the present plan for consolidation and recapitalization was filed with the federal commission. One principal object of the amended plan was to meet the criticism of the state commission with reference to the elimination of Long Beach, and to make provision for common stock only. On June 16, 1948 the state commission issued a memorandum saying that the proposed consolidation was in the public interest, except that there should be no participation whatsoever by the common stockholders of Long Island. On August 25, 1948, the federal commission concluded in the proceeding under sec. 11(b) (2) that voting power was inequitably distributed and ordered that the companies be recapitalized in such wise as to provide for only one class of (common) stock, that stock to be distributed among the shareholders of each company in a fair and equitable manner. To meet, or at least to attempt to meet, the criticism of the state commission (June 16, 1948) the companies filed (November 18, 1949) with that body a further amended petition, which also conformed to the modification suggested by the federal commission in its release No. 9473 dated November 2, 1949.

In the midst of these proceedings Consolidated Edison Company of New York, Inc. (Edison) applied to the federal commission on September 15, 1948 under secs. 9(a) and 10 of the Act asking approval of a purchase offer to all the holders of the common stock of the new consolidated corporation under which Edison was to pay over $28,000,000 of its 3% 15-year convertible debentures provided that there should be deposited certificates of stock entitling Edison to become the holder of not less than 90% of the total amount of the outstanding shares of the common stock of the consolidated corporation, or such lesser percentage in excess of 66-2/3% as

Edison might determine. The commission refused to consolidate Edison's application with the proceedings then pending under sec. 11(e). A hearing on the application of Edison has been concluded but no post-hearing procedure taken. Nor has any step been taken to enforce the order of the commission under sec. 11(b) (2) of the Act, which, as has been said, is really a definite direction to the companies to correct unfair and inequitable distribution of voting power, to recapitalize on the basis of a single class of stock, and to distribute that stock in a fair and equitable manner.

To recapitulate, and to single out certain significant features of the history of the proceedings there was, prior to the assumption of jurisdiction by the federal commission, an effort under state law to compel the Long Island preferred stockholders to surrender approximately 40% of the value of their holdings in a scheme of consolidation and recapitalization. Before that plan could be consummated, federal jurisdiction attached, and there then followed more or less parallel proceedings in the two commissions, federal and state, looking toward consolidation, and toward recapitalization which would eliminate former abuses with respect to voting power and which, above all, would bring about a fair and equitable redistribution among the various classes of shareholders of their respective interest in the company.

It may be well to say at this point, and then to dismiss them from any further consideration, that Long Beach need not be mentioned from this point on, nor Liland Corporation, a company which holds land not used in the system's utility operations. There is no controversy now on the point that any plan should envisage the use of these two companies as subsidiaries of the consolidated corporation, if consolidation is to come about.

### The Issues Outlined.

The problem which confronted both commissions, federal and state, were therefore primarily two: (1) Consolidation was feasible, but was it fair and equitable, not to say necessary, and, if so, (2) Under

a plan of consolidation based on a single class of stock (common) what would be a fair method of distribution of the new common stock to the former shareholders? And so after prolonged hearings the federal commission (which by now was the administrative body solely charged with answering these questions) filed on November 2, 1949, after prolonged hearings, its findings and conclusions. The state commission, charged with different duties in the premises, at that time had before it practically the same proposals which the companies had made to the federal commission. The state commission filed a memorandum on the subject on January 23, 1950, after the hearing in this enforcement proceeding and after the briefs before me had been filed.

### Preliminary Questions.

Before reaching any discussion about how the federal commission dealt with the problems before it, what its proposed solution is, and what the objections to that solution are, it is necessary for me to consider at least briefly, a contention raised by some of the participants: namely, that there is nothing before me at all. The argument here is that the federal commission has no jurisdiction over Long Island and its subsidiaries under the Public Utilities Holding Company Act, and even if it does, the federal commission has taken interlocutory action which prevented the common stockholders from supporting their case in the proceedings before the commission.

At the argument in the proceeding before me it was urged that I defer any decision until the United States Court of Appeals for the District of Columbia has passed upon these same points, which are before that court on appeal by a protective committee for common stockholders. Halstead v. Securities & Exchange Commission, —— F.2d ——. I understand that the appeal has been argued but not yet decided. Nevertheless it will, I think, be clear that it would be wrong for me to hold up consideration and decision of the application for an enforcement order, even though the pending appeal might furnish a plausible excuse for delay.

The grave preliminary question, of course, is that of jurisdiction. But in a proceeding related to this one, in the sense that it concerned itself with a subsidiary of Long Island Lighting Company, a jurisdictional objection precisely similar to that here under consideration was urged before me by counsel for the Public Service Commission of the State of New York, In re Kings County Lighting Co., 1947, D.C.E. D.N.Y. 72 F.Supp. 767. The state commission in that case urged that Kings County Lighting Company was not selling heat, light and power in interstate commerce, and that even though the securities of Long Island were being distributed throughout the states, that would not constitutionally support the application to it of an act assuming to override the state's primary interest in corporations generally, and public utility corporations particularly, operating wholly within the state—substantially the argument which the protective committee is urging in the District of Columbia, and urges here. I mistakenly thought the question important, and gave it rather full consideration. But on appeal, Public Service Commission of New York v. Securities and Exchange Commission, 2 Cir., 1948, 166 F.2d 784, 788, certiorari denied 1948, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763, Judge Learned Hand said "the constitutional question is too trivial to justify discussion." I realize, of course, that on the surface an attack on the constitutionality of the Act might be entirely different from a mere challenge to the jurisdiction because the Act is said not to be applicable. But here, as in the Kings County Lighting case, they come to the same thing. The argument is that if the Public Utility Holding Company Act is applicable to public utility companies operating wholly intrastate then the basis for federal jurisdiction (interstate commerce) is non-existent and therefore to apply the Act would be to violate the constitutional reservation to the states of powers not granted. The answer here, as in the Kings County Lighting case, is that interstate distribution of securities is a sufficient constitutional basis for federal legislation, even passing the point that

the companies promulgating the plan here under discussion have voluntarily submitted themselves to the jurisdiction of the federal commission, and the question whether a stockholder is entitled to complain.

But whether what I have just said is sound or unsound, and regardless of what action might be taken in the District of Columbia by the Court of Appeals, it is plain that with all deference to that Court I must follow the path laid out for me by the Court of Appeals of my own circuit.

■ The second preliminary question (whether all of the proceedings before the federal commission were vitiated because the common stockholders were denied adequate representation) is also before the Court of Appeals of the District of Columbia. The protective committee attempted to solicit from the common stockholders five cents per share for expenses incurred in opposing the plan of consolidation and recapitalization proposed by the companies to the federal commission. Here the argument runs that the companies themselves are represented by a hold-over management composed of a set of "rascals", that the Long Island common stockholders are and will therefore be in need of independent representation, that the federal commission by refusing to permit solicitation of funds has cut off this right, and that in this way the administrative proceedings have become tainted[1]. On that point I can only say that the protective committee was represented before me by competent counsel who presented in great detail and with entire clarity their opposition to the plan. Their reply brief, which was printed, presents their contentions in racy and incisive style. But more than that, the brief and indeed counsel's whole presentation show that they are armed with full details concerning the history and structure of the company. It is difficult for me to conceive how preparation could be more complete or presentation more vigorous even if each common stockholder had paid five cents per share. I find noth-

ing in the record showing that the representation of the common stock before the federal commission was stifled, or was in any way weakened by the commission's action. Its counsel were obviously as vigorous and competent there as they were before me.

### The Issues Considered.
#### (a) Consolidation.

■ I have said several times that consolidation of the three companies here involved is quite feasible. All that really remains is the question whether consolidation is fair and equitable. Opposition on this ground seems to have been rather vocal before the federal commission. On the hearing before me it had dwindled practically to a whisper. But nevertheless there are still tentative suggestions in some of the briefs that consolidation is wrong. From what I heard at the argument, no matter what remains by way of residue in the briefs, the counsel present were not, as I am attempting to do, considering the problem of consolidation *vel non* independently of recapitalization and redistribution of common stock. In other words, they seemed to say they would not oppose consolidation if their clients got more out of it.

There cannot be the slightest doubt (at least there is none in my mind) that consolidation is not only fair and equitable here, but vitally necessary. It was *lack* of consolidation more than any other single feature that contributed to the woes of these companies and permitted deplorable manipulations of a type so familiar before the crash of 1929 and so directly responsible for at least some of its consequences. Nothing more need be said on this topic.

#### (b) Distribution of New Common Stock.

It was, as I have said, originally (1944) proposed to the state commission that the preferred stock of these companies should surrender roughly 40% of the face value of the investment in the interest of the new organization. The plan embracing this proposal was never, in any real sense,

---

**1.** At the argument before me it was even suggested that perhaps the right of free speech and due process had been abridged by the action of the federal commission.

consummated. The amended plan with which the federal commission dealt, and upon which it passed in the release of November 2, 1949, suggested the elimination of the Long Island common stock by the payment of 35¢ per share or an aggregate of $1,050,000 payable out of earnings accumulated subsequent to the effective date of the plan, and before any such earnings were distributed as dividends to the new common stockholders of the consolidated corporation. It was conceded before the federal commission and it is conceded here that the common stock of Nassau and the common stock of Queens (both held by Long Island)[2] were without value, and consequently that the common stock of these companies ought be accorded no participation. The federal commission has disapproved the payment of 35¢ per share to the common stockholders and instead proposed that Long Island common stock should participate in the new common stock to the extent of 6.7%, before giving any consideration to the fact that Queens and Nassau both had long been asserting certain "claims" against Long Island, which need not be mentioned here in detail. The federal commission arrived at the conclusion that even though perhaps legally unenforcible, there was enough substance to these claims to entitle them to consideration as part of the "bundle of rights" possessed by the stock in whose favor the claims were asserted. And the federal commission concluded that from the percentage otherwise allocable to Long Island common stock there should be deducted 1% referable to these claims, the quantity of new common stock thus realized to be divided between the preferred stock of Queens and Nassau. As a result, the final proposal (now before me) by the federal commission is (1) that Long Island common stock should receive 5.7% as its share in the new corporation, (2) that Long Island preferred stockholders should receive 77%, (3) that

Queens preferred stock should receive 11.5%, and (4) that Nassau preferred stockholders should receive 5.8.% The problem presented to the commission in connection with the "claims" deserves discussion, however brief, under a heading of its own.[3]

### (b 1) The "Claims".

It has been hinted that at least until 1933 Long Island, following a pattern all too popular with public utility holding companies, had been guilty of a number of indefensible intercorporate maneuvers as a result of which Queens and Nassau were victimized. Because of the manner in which these operations were carried out, claims also arose by Queens against Nassau, and by Nassau against Queens. Roughly the transactions covered the period 1927 to 1935, and one would be right in assuming that at the time of the proceedings before the federal commission most of the claims were stale. In fact, at the argument before me it was practically conceded that only one claim (asserted by Queens) could survive the legal bar of the statute. Naturally, both the preferred and the common stockholders of Long Island (but particularly the former) argued before the federal commission that no effect ought to be given to these claims because not only were they barred by the statute of limitations but also by a decision in what is referred to in the record as the Chelrob case, Chelrob, Inc., v. Barrett et al., 1941, 177 Misc. 521, 31 N.Y.S.2d 259; Id., 1943, 265 App.Div. 455, 39 N.Y.S.2d 625; Id., 1944, 293 N.Y. 442, 57 N.E.2d 825. The commission decided, however, that the fair and equitable thing to do was to give *some* weight to these claims, to be reflected in the allocation of new common stock, regardless of whether they were legally enforcible or not, and to make Long Island common stock responsible for whatever value was allocated to these claims. In

---

2. Actually Long Island holds the common stock of Queens, and the latter holds the common stock of Nassau.

3. Perhaps it would be more logical to postpone discussion of the claims to a later point, because the federal commission's procedure was first to arrive at the stock distribution percentage, and *then* to analyze and weigh the claims. But I have reversed the order because all participants were affected by the handling of the claims, and only some by the other problems.

other words, the claims were treated as "integral elements of the 'bundles of rights' of the respective claimants". This method of dealing with claims has been used by the commission in prior instances and has been specifically approved by the courts. In re Illinois Power Co., D.C.Del.1947, 74 F.Supp. 317, affirmed sub. nom. In re North American Light & Power Co., 3 Cir., 1948, 170 F.2d 924. There is very little I need add to Judge Kalodner's discussion of the subject in the case last mentioned. A procedure under which administrative bodies like the Interstate Commerce Commission, and the bankruptcy courts, give effect to unliquidated and even unenforcible claims by a process resembling settlement is nothing new. The alternative is a decision by the administrative body or the bankruptcy court, specifically dealing with each claim, determining the question of enforcibility, and allocating an exact amount. Even to suggest such a course is to demonstrate that in a case like that at bar the process would be endless, the volume of litigation appalling, and the effect the destruction of any possibility of reorganizing utility companies during the lifetime of even the youngest stockholder. I am not suggesting that an unjust result can ever be condoned because it takes time to reach a just one. But I believe that there are situations, especially those where corporate affairs and the interest of stockholders have been for years hopelessly muddled, when justice does not demand meticulous appraisement and decision of each and every issue that a casuist can dream of—situations where the only possible course is thorough investigation and, as has been shown in the matter of the "claims" in this case, sincere effort to approximate and balance equities and thus to avoid the most unjust result of all, the indefinite perpetuation of an intolerable state of affairs.

██ Enough has been said up to this point and on this subject to suggest the arguments likely to be raised against the disposition of the claims by the federal commission, arguments which were reiter-

ated before me. Those representing the preferred stock of Queens and Nassau were in hearty accord with the view of the commission that legal obstacles to the assertion of the claims should not stand in the way of a settlement, but each was discontended with the share which the federal commission allotted to it. Moreover, once it was ruled by the federal commission that the common stock of Long Island, having been unjustly enriched by the transactions complained of, should bear the burden of compensation to the injured stock (Nassau and Queens preferred), it was urged by the protective committee that this was a piece of injustice: that Long Island common stock should, in effect, retain its ill-gotten gains. And all those immediately concerned,[4] pro and con, were at one on the point that the federal commission was bound to attribute to each claim a precise dollar value. The commission could have eliminated considerable wrangling on the part of the stock affected, and much work on its own part, by simply ignoring the claims, or on the other hand it could, at least in theory, have required in effect the separate litigation of each claim before it. The first course would have been, under the circumstances, inequitable; the second, completely absurd. The procedure and the determination of the federal commission, to my mind, is fully supported by the nature of the problem and by the facts before it.

I turn now to three much more specific objections which were urged against the allocation of stock arrived at by the federal commission. These objections were all voiced by the common stock of Long Island alone, which it will be remembered was given 5.7% of the new common stock after the claims just spoken of had been adjusted. It is contended that the action taken by the federal commission was wrong because it failed to evaluate and give effect (1) to possible reduction of an item of depreciation aggregating $10,263,969; (2) to the enhanced earnings of the company which will accrue within the next few years from an ambitious construction program (running

---

4. That is, the conflicting stock interests.

to $30,000,000), as well as from the advent of natural gas and the expected increase of both gas and electric consumers, and (3) to certain other considerations affecting the real value of the Long Island common stock *visa vis* the preferred, notably the effect of the 1944 plan of recapitalization proposed to the state commission, and of the reproduction cost of Long Island's plant, evidence of which the federal commission refused to accept or consider.[5]

### (b 2)—The Depreciation Item.

Mention has already been made of the fact that there now stands on the consolidating balance sheet of the constituent companies as of March 31, 1949 an item called "unearned surplus—special" in the amount of $10,263,969. The reason for the inclusion of this item ought to be explained. In a memorandum (August 6, 1946) the state commission found on the basis of depreciation studies of Long Island's properties that its then reserves for depreciation were inadequate on a straight-line basis by an amount which when projected to March 31, 1949 aggregated $7,580,084. The state commission also ruled that the depreciation reserves of Queens and Nassau were inadequate. All of the deficiencies when projected to March 31, 1949 totalled $10,263,969 which is the amount just spoken of as having been labeled "unearned surplus—special" in the consolidating balance sheet.

The common stockholders' argument under this head runs as follows: the federal commission did not, and indeed could not, make any determination of the true depreciation reserve of the consolidated company. That is and will be solely the function of the state commission. Therefore, *non constat* but the state commission may, after further study, decide that some very large portion of this amount need not remain any longer in what is in effect a reserve, and may be transferred to assets. This action, if taken, will enhance the rate base, and that enhancement will be reflected in earnings. And even if the

state commission makes definite the ruling (already foreshadowed) that the new company must carry a reserve of somewhere near the figure mentioned, still it will be open to the management to challenge this determination, and either to reduce the figure by court action or perhaps even to receive the sanction of the courts to a procedure under which the reserve is not set up all at once, but by gradual increments over a period of years—a course which has been followed in at least one other case in the state courts.

It will be observed that the validity of the whole argument depends upon the assumption that any reduction in depreciation reserve charged back to assets is somehow peculiarly the property of the common stock of Long Island. To say the same thing in another way, the common stockholders who make this argument assume that if the depreciation reserve had been fixed and definite when the federal commission made its allocation of the new common stock the latter, and the latter alone, would have been the beneficiary of any diminution of reserves formerly set up, because any increase in assets would compel the federal commission to revise upward its estimate of income, and compel that commission to recognize that this surplusage belonged only to common stock. It seems to me that this assumption is wholly unfounded. In its opinion and findings the federal commission discusses the question of depreciation. It is axiomatic that under federal law stock is to be allocated on an earning basis and not on an asset basis, and an increase in assets under federal procedure does not necessarily mean increased income. In fact, this is one point of serious fundamental conflict in the standard of value used by the federal commission as compared with that which the state commission advocates. If one assumes that there was no question of the amount of depreciation, there is nothing whatever to show that the stock allocation made by the federal commission would have been, percentage wise, any

---

5. Really the evidence was not available. Had it been actually offered, the federal commission would probably have received it. But undoubtedly it would have been given little weight.

different than it was, for the projected earnings of the consolidated company were not in any precise ratio to assets. And if that be so, the former common stock of Long Island has not suffered in the slightest degree because its share of earnings will be at the same rate before any windfall in the way of reduced depreciation as it will be after.[6]

But even were it otherwise, in making its informed guess concerning the value of any stock by the use of projected earnings, the federal commission of necessity must be guided very largely by probabilities. The commission has obviously taken the attitude that any reduction in the depreciation reserve is improbable, and therefore should not be taken into account in estimating future earnings. To me at least this seems the only reasonable position that could be adopted, especially in the light of prior suggestions and rulings by the state commission on this subject, over which it admittedly has exclusive administrative jurisdiction.

### (b 3)—Enhanced Earnings Arising from Growth and Expansion.

■ Particular voluminous material was submitted by one holder of Long Island common stock to show that the federal commission had not been optimistic enough, and that the range of its income predictions was too short. Incidentally, the person in whose behalf this contention was strongly stressed had purchased his stock *in medias res,* so to speak. The commission had the benefit of his present speculations concerning enhanced future earnings, supported as they are by data supplied by several college professors only toward the end of its proceeding. This was because that particular stockholder bought his stock as the proceedings before the federal commission were drawing to a close. True, he did try to inject himself belatedly into the proceedings, as I have intimated, but the federal commission denied his application. It is probable that the traditional rule in federal equity which prevented the purchase and waging of law suits by one acquiring stock after the commission of the wrongs complained of does not apply here. In any case, the record before the commission and before me sets forth very fully the argument concerning future growth, with which the protective committee has also associated itself.

Here again, there seems to be an underlying assumption that in order to do equity to the former common stockholders of Long Island it must be assumed that all the benefit of future growth belongs to them. They dilate for example on the wonders of natural gas, soon, they say, to have a cash value to the consolidated company, and imply that the larger these earnings

6. As will be mentioned in another connection at a later point, the federal commission did discuss and analyze a technique for the allocation of Long Island value as between common and preferred under which the value of the common stock was arrived at by estimating how much income would remain, over a period, after preferred arrearages had been met. Apparently because the federal commission used this approach, the common stock throughout the argument before me assumed that it had a vested operative right to treatment as an equity security not only as of March 31, 1949, and of the effective date of the plan but in perpetuity. It asserted before the federal commission a right to any and all unconsidered trifles no matter when snapped up, such as economies effected by consolidation. Of course, the common stock stoutly denied that it was to be considered an equity stock in the matter of charges against it, such as "claims", even though its gains from *these* were actual, and a part of the past history of the company and even though, barring excessive management expense or sheer waste, they could have come to rest nowhere except in the pockets of the common stockholders.

It is probably irrelevant, but under the circumstances disclosed here I am by no means prepared to accept the assertion that in equity the common stockholders are entitled to all of the windfalls past, present and future. I say this is probably irrelevant, because the federal commission manifestly treated Long Island common stock as having presently operative rights, on a going concern basis, and endeavored to give to the common shareholders of Long Island the equitable equivalent of the rights surrendered.

turn out to be, the greater should be the percentage of allocation to the old common stockholders of Long Island. This attitude on the part of Long Island common stockholders is shown at its extreme by the fact that it was urged seriously in their behalf before the commission that even prospective savings flowing from consolidation should be credited to them and them alone.

I believe that Long Island common stock misconceives completely what the federal commission was trying to do. The problem before it was first to estimate earnings, and then to determine what should be the percentage of interest given to each component company in the consolidated company. In the case of Long Island the percentage arrived at was 83.7% of the predicted consolidated net income of $3,500,-000. Queens received 10.7% and Nassau will get 5.6%. These percentages are not identical with the amount which each one of the companies is found likely to contribute to the consolidated net income. Long Island receives a greater percentage of its estimated contribution because the quality of its earnings is better; Queens and Nassau receive less than their estimated contribution because qualitatively their income is inferior according to the findings of the commission. This treatment of the distribution is amply justified by the facts. To illustrate, one curious and imponderable element in the appraisement was the performance of Nassau which, with the least efficient plant, the smallest gas rate base, and the smallest gas production, realized better earnings than Queens or Long Island. The Nassau plant is in poor condition. The state commission has described it as so inadequate that it would be unfair to burden consumers with the excessive expense of its operation. Manifestly this was a circumstance pointing to inferior quality of its income.

When it came to divide between the preferred stockholders and the common stockholders of Long Island the percentage of the consolidated corporation awarded to their company (83.7%), the commission concluded, after weighing all of the equities, and the contentions of the respective interests, that it would be fair and equit-

able to give 77% of the new common to the preferred stockholders of Long Island, and 6.7% to the common stockholders (prior to the charge for claims). Everybody concerned, including the commission, tried to arrive at the respective values of the interests, as was required, purely on the basis of projected earnings of the new company, and estimating the amount of these was the first task. The next step was to calculate how long in point of time it would take before the company had (from these earnings) discharged the arrears on the preferred stock, and then to calculate how much per annum would be available after that period for distribution to old common stock. The "present value" of the common was then to be determined. Without mentioning, at least until a later point, subsidiary complications injected by the 1944 plan (affecting the amount of preferred arrears) it is obvious that what the old common should receive by way of allocation depended upon certain postulates, some of them arrived at by prophecy, and some of them heavily tinged with opinion. The primary factor in all calculations was, of course, estimated net income—a prophecy.

The representative of the applicant companies used a figure of $2,000,000 for Long Island. The proponent of the protective committee's views assumed a consolidated net income for the whole system of $4,000,-000. The commission itself used as reasonably prospective net income of Long Island a figure of $2,815,000 a year, being its own estimate of what Long Island would contribute to the total income of the consolidated company ($3,500,000). At the outset it can be seen that these particular postulates of income differed among themselves not only in amount but also in principle. Moreover, the formula for calculating present worth was sheer opinion and the particular formula used for that purpose by the protective committee's expert was demonstrably unfair.

But putting to one side all of these mechanics of calculation (which are only as sound as their weakest factor), the basic complaint of the old common stockholders is that the informed guess of the commis-

sion concerning respective net income of the consolidated company is too guarded and too pessimistic, that it should have projected a situation under which Long Island, either alone or in combination with the other companies, will soon have disposed of its preferred stock arrearage, that the common will in a comparatively short time be enjoying huge revenue, and that the present value of the stock is therefore very high. To support this optimistic thesis counsel went the extreme length of arguing (as has been mentioned) that somehow or other a treasure trove in the way of reduced depreciation will be discovered and will be reflected in earnings (a contention dealt with under a previous head). But most important of all, counsel predicted that there will be a tremendous boom in the sale of heat, light and power, and the income will, with the blessing of the state commission, go into the coffers of either the Long Island alone, or of the Long Island in combination with its former subsidiaries—another species of manna. One of the counsel even seemed to argue before me that the federal commission had left wholly out of account the possibility of enhanced earnings as a result of growth. The record, of course, contradicts this specifically. The federal commission was quite aware that there may be an improvement in the earning picture of the consolidated company with the advent of natural gas. In fact, it criticised one of the experts because he left that factor out of account. Analyses reflecting the past trends of growth in load, sales, revenues, customers, property investment and other relevant growth factors were used by the commission, as it says plainly, in formulating its judgment. Counsel for the recently acquired stock, who dealt with this subject on the argument, must be cognizant that this is so, and his position must therefore be, as I have indicated, that the more optimistic prophecies of his professors were required to be accepted by the commission, rather than its own estimates based upon the facts before it, and the legitimate inferences that can be based on those facts. The short answer is, of course, that even a district judge is not required to believe everything an expert tells him, and an administrative body composed of persons themselves expert in the field is much better qualified to deal with expert evidence.

The common stockholders endeavored also to enhance the projected earning estimate by pointing to the fact that a program of expansion of Long Island and its subsidiaries is in existence, and that some money has already been disbursed in the execution of this plan. They charge that the federal commission gave no weight to this potential revenue.

I think little time need be devoted to this subject. Even after consolidation takes effect the debt burden of the new company will be substantial in relation to the outstanding common stock. The findings and conclusions of the federal commission suggest that wise management will, and probably must, finance improvements and betterments, as well as cost of new facilities, by the issuance of common stock rather than by addition to the company debt. If that be so, it is almost impossible to see how the net income arising from the expansion program can be fairly estimated, and even if that *were* possible, why was it incumbent upon the federal commission to consider such income part of the existing equities possessed by the *old* common stock of Long Island? It seems to me that this is one more of those factors which ought to be left at large, and treated, just like the general possibility of future growth, as one of the imponderables which justifies the conclusion that the old Long Island common stock, along with the other securities, is to be treated as a participating interest in a going concern. I suppose there will be those who will assert that they can measure and predict the net revenue which each dollar of investment will yield, and who will believe that any one who questions the validity of such predictions is a kind of heretic, or at least a babe in the financial woods. However, since 1929, some degree of skepticism can be pardoned. And it will surely be admitted, even at the very lowest level of discussion of the matter, that the quality of manage-

ment both in the planning and use of a given property is a factor in its productivity—a factor which is nearly unpredictable.

I believe that the allocation of stock of the new company by the federal commission is eminently fair, and that it has taken every reasonable step to place its prediction of future income on the soundest possible basis. Had. the commission yielded to the suggestion that prosperity was right around the corner for utility companies operating on Long Island, and given definite mathematical weight to this hope, it might have been justly accused of seeing visions instead of formulating estimates. The line between a vision and an estimate may be difficult to draw, but it is there nevertheless.

### (b 4)—The Effect of the 1944 Plan, and the Contention about Reproduction Cost.

■ Two matters which I consider of minor importance ought not be left without some discussion, lest it be thought that they were given no consideration at all.

I have mentioned before that in calculatting the distribution of the new stock between the old preferred and common stock of Long Island there was employed as one factor the amount of arrearage on preferred stock at March 31, 1949. What the precise amount of that arrearage is might be thought to depend upon the question whether the plan proposed by Long Island to the state commission in 1944 was or was not ever consummated in law. For under that plan the preferred stock was to surrender some 40% of the then outstanding obligation. Complaint was made before me that unless the federal commission made a definite ruling either way (concerning consummation *vel non*) it, nor any one else, could know what figure of arrearage to employ, and consequently could make no valid calculation. Logically the proposition seems to be unanswerable, and perhaps it is, if certain underlying assumptions are correct.

The first assumption underlying the argument is that, as matter of law, the 1944 plan either became effective or it did not, and while the protective committee's expert based all of his figures on the theory that the plan had *not* been consummated, that committee is still entitled to argue, as it did, that nevertheless the federal commission was bound to furnish an unequivocal answer. That plan, it will be remembered, was reluctantly approved by the state commission, and was filed in the office of the Secretary of State. But because of various proceedings in the federal court, as well as before the federal commission, and the granting of stays from time to time, there is grave question whether any legal rights were in point of fact created. But be that as it may, the assumption that the federal commission was bound to answer the legal question is completely groundless. What the federal commission in fact did was to treat the Long Island security holders as participants in a proceeding in *equity*. The 1944 plan had been denounced as unfair and inequitable both by the state commission and the federal commission. In reality, that plan had and has no present vitality or importance, and if it had, the federal commission was obviously free to refuse to define, as it did, the technical legal rights flowing from that plan. The commission could simply have refused to enforce such "rights", if any, because of want of equity.

But the federal commission did not go so far. The second false assumption entailed in the argument here under discussion is that without ruling on the legality of the 1944 plan no valid calculation using preferred stock arrearage as a factor could be made by the federal commission until that factor was defined. The fact is that the commission made the calculation *both* ways (i. e., first on the assumption that the plan was not operative, and second on the assumption that it was). But neither was used as a rigid controlling formula of division: both were "analytical factors" which formed part, but only part, of the basis used to determine the equities subsisting between the two classes of stock.

■ The second complaint, also by the old common stock of Long Island, is that the federal commission refused to accept evidence of reproduction costs, and to take these into consideration in valuing the

stock of Long Island. Even if the federal commission used the asset standard of value employed by the state commission, rather than the earnings standard which it does use under the rulings of the Supreme Court, reproduction costs would be at best an unsure guide. In all likelihood no one would "reproduce" the plants of the component companies as they are. But beyond that, the present almost prohibitive cost of building has underlined the inherent long range weakness in the reproduction theory, even for the valuation of improved real property as such. It would be the plainest folly in the case of a utility company to use present reproduction cost as the yardstick of value, and at the same time attempt to reconcile the result reached with the going concern theory.

### Conclusion.

It will be clear at this point, I think, that those who quarrel with the amended plan, as modified, have framed their objections upon two basic complaints: (1) that the federal commission did not precisely calculate and give proper weight and respect to certain items of potential future income, and (2) that in any event the hands of the federal commission were tied, and it could not furnish any reliable prediction of consolidated income, until the liquidation (under rules of law) of at least three major controversies, involving complicated questions of law and fact, namely, those concerning (1) depreciation, (2) inter-company claims, and (3) the effect of the 1944 plan on Long Island's capitalization.

█ The first complaint, which to me seems wholly groundless, is almost certainly produced by a misunderstanding of the federal commission's function. The Supreme Court has said that the Securities and Exchange Commission must evaluate stock by the yardstick of future earnings, and on a going concern basis. To criticise the commission because its conclusion may be in part based on inexact data is to utter an absurdity, for by hypothesis the commission deals not with absolutes but with probabilities: want of mathematical certainty is inevitable in the prediction of income. But once a rough approximation is reached by honest and painstaking examination of the facts there is disclosed, as here, a basis for equitable distribution among the conflicting interests. Future fluctuations from the norm will not derange the basic equities thus determined and allotted.

The same considerations, in slightly different form, furnish what I think is a complete answer to the second basic complaint of the objectants. It would be intolerable in a case of this kind, as I have mentioned before, if the federal commission were required to wait upon long-drawn out litigation, and the precise liquidation of items like depreciation, inter-company claims, and "rights" arising from involved corporate maneuvers designed to perpetuate a bad situation. But I pass that point, except to the extent that it sheds light on the true functions and powers of the commission. That body is of course under a duty to make a careful expert analysis of all of the relevant facts. It must take into the calculus of probabilities everything that rightly belongs there. But once it has made a careful study, as it has done here, its determination of what is necessary and proper, and what is fair and equitable need not wait upon the resolution of legal technicalities. These latter might be important if it were the function of the committee to preside over a liquidation, but its mission is exactly the opposite of that. To me there is a curious anamaly about the fact that the most vocal objections to the equity technique employed by the federal commission comes from the old common stockholders of Long Island, who to me are preeminently the beneficiaries of that very technique. The state commission has repeatedly and vehemently stated that on an asset basis the old common stock of Long Island has no value whatever. The original proposal to the federal commission was that that stock should receive 35¢ per share. The commission refused to sanction this, and applied a much more generous standard. Yet here are those same common stockholders now raising contentions which, if adopted, would preclude practically forever the making of salutary and needed changes in the corporate structure. One is tempted to think that some common

stockholders feel that since the old common of Long Island is "equity" stock, and since it is now (asset-wise) valueless, nothing will be lost, and perhaps something gained by a sort of rear guard delaying action, and the use of every technicality in the armory of the law to prolong it. I hasten to add that I do not intimate that there have been any dilatory tactics on the part of counsel before me, who have probably complied, as is proper, with their clients' desire to raise the contentions that I have heard. It is, however, undeniable that injurious delay, if not the object of these contentions, would certainly be the result of them.

It is my own finding and belief that the amended plan, as modified by the federal commission, should be enforced because it is both proper and necessary, and fair and equitable to all of the interests concerned.