■ FRANK LIROSI, Respondent, v STANLEY I. ELKINS et al., Appellants. (Action No. 1.) TYPOGRAPHIC IMAGES, INC., Appellant, v FRANK LIROSI et al., Respondents. (Action No. 2.) — In two actions, the first of which sought, *inter alia,* an adjudication of Frank Lirosi's interests in Typographic Images, Inc., and the second of which sought injunctive relief and money damages for unlawful competition, the appeal is from a judgment of the Supreme Court, Queens County (Hyman, J.), dated July 7, 1981, which, *inter alia,* adjudicated Frank Lirosi's interest in Typographic Images, Inc., to be 25%, directed said corporation to deliver 25% of its authorized no par value stock to Frank Lirosi and dismissed the complaint in Action No. 2 based on the doctrine of "unclean hands". Judgment modified, on the law, by deleting the thirteenth decretal paragraph and substituting therefor the following: "Typographic Images, Inc., shall thereafter deliver to Stanley Elkins 75% of the authorized no par value shares of said corporation. Stanley Elkins shall satisfy his indebtedness in the amount of $2,301.51 to Cold Print Composition Services, Inc., and Cold Graphics, Inc., the indebtedness of defendant Vulpis in the amount of $75 owed to Cold Print Composition Services, Inc., and Cold Graphics, Inc., and the indebtedness of Rudolph Nardone in the amount of $13,725 owed to Cold Print Composition Services, Inc., and Cold Graphics, Inc., by offsetting said indebtedness against the $30,000 owed Stanley Elkins, as a creditor of Images, and thereby reducing Images' indebtedness to Elkins to the amount of $13,898.49." As so modified, judgment affirmed, with costs to respondents. With regard to Action No. 1, in the mid-1960's Stanley Elkins, Nunzio Vulpis and Rudolph Nardone held an equal interest in Towne Typographics, Inc. (Towne), a corporation whose business was "hot metal" typography. Elkins, Vulpis and Nardone also were the partners of Cold Print Composition Services (Composition Services), located at the same address as Towne, which performed "cold print-strike on" typography. Because of his 25 years of experience in the industry, Frank Lirosi (plaintiff in Action No. 1) was asked by Elkins to run the cold print-strike on operation at Composition Services, as a partner. Lirosi accepted and became an equal partner, obtaining a 25% interest in Composition Services. On October 28, 1968, the partners of Composition Services incorporated their business as Cold Print Composition Services, Inc. (Cold Print); 200 shares of stock were issued and each of the partners received 50 shares. A shareholders agreement, executed February 9, 1970, provided, *inter alia,* that no shareholder could dispose of any shares of stock except with the written consent of the other shareholders and only after first offering, in writing, all of his shares for sale to the corporation. Lirosi was named president and he ran the cold print operation in all respects, except defendant Elkins was in charge of the corporate books and records. To avoid union problems, the shareholders of Cold Print formed a dummy corporation, Cold Graphics, Inc. Each shareholder retained at 25% interest in Cold Print and acquired a 25% interest in Graphics. From 1972 to 1974, Lirosi operated Cold Print and Graphics at a profit; the combined gross profit averaged approximately $185,000 a year. According to Elkins, the net profit of a cold print-strike on operation should be approximately 25% of the gross profit. In contrast, during this period the hot-metal typography operation at Towne was steadily deteriorating due to the high cost of type setting and the union salary scale for employees in hot-metal print shops. In 1974, Towne inaugurated a photo-composition department, a new technology that was coming into vogue and which catered to the same customers serviced by the hot-metal print shops. Although photo-composition was still in an infancy stage and the department at Towne was being operated at a substantial loss ($55,000), Elkins was of the belief that the new photo-composition equipment would

make type setting less expensive than the hot-metal operation and would eventually replace the latter industry. Lirosi concurred in this belief. In November, 1974, Cold Print authorized the incorporation of Typographic Images, Inc. (Images). According to Lirosi, at a shareholders meeting prior to Images' formation, Elkins informed him that Cold Print and Graphics would eventually have to be dissolved because the new corporation, Images, would need the assets and equipment of those corporations. Elkins assured Lirosi that his share in Images would be at least the same as his share in the dissolved corporations and that his interest would grow with the new corporation. Lirosi was further informed that only he and Elkins would initially be located at Images; Nardone and Vulpis would remain at Towne to phase out the hot print operation and then transfer its assets to Images. Shortly after Images was incorporated, all the employees, machinery, equipment, inventory, customer accounts and "good will" of Cold Print and Graphics were transferred to Images, where Lirosi commenced the cold print operation. The accounts receivable of Cold Print and Graphics were sent to Vulpis, at Towne, to serve as a clearing house to satisfy the existing accounts payable. Elkins acknowledged, at his pretrial deposition, that the only item Images had to buy to commence operations was paper. Thereafter, at a closing held on January 2, 1975, Vulpis and Nardone purchased Elkins' shares of stock in Towne. Elkins received $30,000 cash, the photo-composition equipment located at Towne (valued, after depreciation, at $49,451) and, unbeknownst to Lirosi and in violation of the shareholder agreement dated February 9, 1970, Vulpis' 25% interest and Nardone's 25% interest in Cold Print and Graphics. Elkins also assumed the remaining indebtedness on the photo-composition equipment, in the amount of $49,541. On January 2, 1975, Images' accountant recorded a $30,000 deposit by Elkins as a "capital contribution" in the corporate ledger and recorded the deposit on Images' first balance sheet as "Stockholders' Equity-Common Stock — 200 Shares Authorized, 10 Shares Issued and Outstanding". Also recorded as an asset was the photo-composition equipment which Elkins acquired from Towne. However, the assets acquired from Cold Print and Graphics were never recorded on any of Images' financial statements. All the aforesaid entries and omissions were pursuant to Elkins' instructions. Cold Print was dissolved by a certificate of dissolution filed February 17, 1976, and Graphics was dissolved by a certificate filed October 27, 1975. In preparing for the dissolution of Cold Print and Graphics, the same accountant retained by Images prepared a work sheet for both corporations jointly which disclosed that Nardone owed Cold Print $13,725, Vulpis owed Cold Print $75, and Elkins owed Graphics $2,301.51. Despite the indebtedness of Elkins, Nardone and Vulpis, the accountant never recorded the amounts as assets of Cold Print and Graphics when calculating the dissolution value of each shareholder's interest in said corporations, in accordance with Elkins' instruction that the debts had been forgiven by an agreement among the four shareholders. However, Lirosi testified that he had no knowledge of the indebtedness of the other shareholders. Although the accountant computed the dissolution value of a 25% interest in Cold Print and Graphics at about $4,150, the record clearly indicated the amount was understated and no check, in that amount, was drawn to the order of each shareholder. The accountant explained that the dissolution share was an asset distribution; it represented the value, after deducting depreciation computed for tax purposes, of the Cold Print and Graphics equipment located at Images. Although Elkins claimed the amount was never recorded as an asset in the corporate books of Images because the equipment was out of date and useless, his contention was belied by an employee at Images, who testified that at the time of trial the cold print-strike

on operation at Images was still being performed with the original equipment acquired from Cold Print and Graphics. Moreover, after the first 10 months of operation at Images, the cold print-strike on operation accounted for approximately $108,648 out of Images' total sales, in the amount of $433,393; for the fiscal year ending January 31, 1976, the cold print-strike on operation accounted for $165,540 out of the total sales, in the amount of $622,310; and for the fiscal year ending January 31, 1977, it accounted for $143,428 out of Images' total sales, in the amount of $962,840. For almost three years after Images had been incorporated, Lirosi continued to run the cold print-strike on operation selling to the prior customers of Cold Print and Graphics and obtaining some new accounts. Images also acquired new accounts for its photo-composition operation. During this period, Lirosi repeatedly asked Elkins for his shares of stock in Images and for a shareholders agreement. Elkins responded to said inquiries with a variety of explanations for the delay. In 1977, the accountant had informed Lirosi that he had computed his share in Images at 3%, but, at trial, the accountant could not explain the basis for his calculation. In the summer of 1977, prior to commencing a five-week vacation, Lirosi demanded his stock and a shareholders agreement. Upon returning in September, 1977, Elkins, as president of Images, terminated Lirosi's employment and offered him a check of $5,000 if he would sign an agreement not to solicit accounts which Lirosi had first acquired and serviced for Cold Print and Graphics and, then for Images. Lirosi refused to sign the agreement. For his 25% share of Cold Print and Graphics, Lirosi received neither stock in Images, nor money, nor anything else. Elkins testified that he investigated and confirmed rumors that Lirosi, while still in Images' employ, was forming a corporation named Wollir Graphics, Inc., a defendant in Action No. 2, to compete with Images, and that was the reason for the firing. In addition, Elkins maintained that the formation of Images was solely the result of his own efforts and that Lirosi came over to Images merely for a job, at a salary of approximately $325 a week. We concur with the finding of the trial court that Lirosi is entitled to a 25% interest in Images. The percentage was accurately derived from Lirosi's interest in Cold Print and Graphics. Elkins was not only a shareholder of Cold Print and Graphics, but also the officer and director entrusted with its internal financial matters. As such, he owed a fiduciary duty to Lirosi as well as the other shareholders. On the date Images was incorporated, the conduct of the parties indicated an intent to effectuate a "de facto merger" of Cold Print and Graphics with Images. As the director entrusted with the financial details of the merger, Elkins proceeded to breach his fiduciary duty to the shareholders of Cold Print and Graphics by, after completing the transfer of all the assets of these ongoing, profitable corporations to Images, omitting to record the value of the transfer on the books of the new corporation. It is undisputed that Images was initially capitalized with only the assets — equipment, inventory, accounts (customer lists) and good will — of Cold Print and Graphics. In addition, all of the employees of those companies became the initial working force of Images. The record supports the inference that Images required the financial basis, which these profitable corporations could furnish, in order for it to commence an operation employing an experimental printing technology in a nonunion shop atmosphere. For the transference of all the aforesaid assets, Lirosi, a shareholder in Cold Print and Graphics, received nothing but the empty promises of Elkins that his corporate shares in Images would be forthcoming. Lirosi's employment was terminated after the business generated from the photo-composition operation flourished. As was noted in *Chelrob, Inc. v Barrett* (293 NY 442, 461-462): "The rule that must be applied in such a situation has been stated by the Supreme Court of

the United States. 'The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared is founded in soundest morality, and we now add in the soundest business policy.' (*Geddes* v. *Anaconda Mining Co.,* 254 U. S. 590, 599.) Though the dual position of the directors does not itself render such transactions void, it does make 'the unprejudiced exercise of judgment by them more difficult' and 'should lead the courts to scrutinize these transactions with care.' (*Everett* v. *Phillips* [288 NY 227], *supra,* p. 236.)" Applying the *Chelrob* rationale to the transfer in this case, Elkins, as a director of both Cold Print and Graphics and of Images, did not meet his burden of proving the fairness of the transfer of the assets of Cold Print and Graphics to Images. As the trial court correctly posited, "[i]f this court [were] to accept the position taken by defendants Elkins and Images, it would necessarily result in a complete non-remunerated loss to Cold Print of 'everything — all of its assets, good will, accounts, machinery, equipment and identity' built up by it over the years as a 'profitable corporation'." From the surreptitious manner in which the transfer was effectuated and from the fact that only Elkins and Images derived any benefit from the transfer, we concur with the trial court's finding that Elkins initially planned the transfer for his own personal benefit and, thus, breached his fiduciary duty as a director to act in good faith. Moreover, at the time Elkins instructed the accountant to record on the books of Images his personal deposit of $30,000 and the depreciated value of the photo-composition equipment, which was subsequently transferred to Images, Elkins had secretly acquired the shares of Vulpis and Nardone in Cold Print and Graphics and, ergo, the controlling interest in Images. As the majority shareholder, Elkins had his cash deposit recorded on Images' balance sheet as "Stockholders' Equity", which indicated the consideration for Elkins' contribution was the only authorized, no par value stock issued by the corporation. There was never an agreement with the remaining shareholder that, in return for Elkins' contribution, he would acquire the sole interest in Images or that there would be an increase in his share and a proportionate decrease in Lirosi's share in the corporation. As the majority shareholder, Elkins owed a duty of the utmost good faith toward the minority shareholder and it was improper to breach his fiduciary duty by using his power in bad faith or for his individual advantage, at the expense of the minority shareholder (see, generally, *Kavanaugh v Kavanaugh Knitting Co.,* 226 NY 185; *Klurfeld v Equity Enterprises,* 79 AD2d 124). Therefore, at best, Elkins' $30,000 contribution to Images can only be construed as a loan, and this court will treat it as such. In view of the fact the indebtedness assumed by Images on the photo-composition equipment exceeded its book value, the contribution will be discounted. Accordingly, Elkins will be permitted to satisfy the indebtedness of Nardone, Vulpis, and himself to Cold Print and Graphics, in the amount of $16,101.51, by offsetting said indebtedness against the $30,000 owed Elkins, as Images' creditor, and reducing Images' indebtedness to Elkins to the amount of $13,898.49. We reject appellants' contention that upon a finding of a "de facto merger" Lirosi's exclusive remedy was an appraisal of his stock in Cold Print and Graphics at the time of the transfer. Under section 910 (subd [a], par [1]) of the Business Corporation Law, appraisal rights only accrue to a shareholder entitled to vote, who does not assent

to the proposed fundamental change in the operation or organization of the corporation, i.e., it is the dissenting shareholders' exclusive remedy. Lirosi never objected to the *de facto* merger. Moreover, appraisal is not the exclusive remedy where the transaction involved bad faith, overreaching or fraud (Business Corporation Law, § 623, subd [k]; *Klurfeld v Equity Enterprises, supra;* 6 Cavitch, Business Organizations, § 112.01[1]). In addition, a court of equity is not precluded from fashioning a suitable remedy, although precedent is wanting (*Rice v Van Vranken*, 132 Misc 82, 86, affd 225 App Div 179, affd 255 NY 541). Accordingly, we conclude that the trial court's remedy, as modified in accordance with this decision, provides a suitable remedy to fit the wrong. Damiani, J. P., Lazer, Mangano and Gibbons, JJ., concur.